NATIONAL OIL COMPANY *v.* REEVES.

5-1378                                                    310 S. W. 2d 242

Opinion delivered February 10, 1958.

[Rehearing denied March 17, 1958]

*Rose, Meek, House, Barron & Nash,* by *A. F. House* and *John H. Haley,* for appellant.

*Cooper Jacoway,* for appellee.

Ed. F. McFaddin, Associate Justice. This is a suit by an attorney to recover for his services, and also to have his stock holdings recognized in the appellate corporation.

Appellee Guy B. Reeves is an attorney and is hereafter referred to as "Reeves". Appellant National Oil Company — hereinafter called "National" — is an Arkansas corporation, engaged in prospecting for oil and gas in Louisiana, and at the time of the trial below had one gas producing well. Reeves filed this suit against National, for judgment for his services, and also praying that his stock holdings in National be recognized. National (a) denied owing Reeves any substantial amount for services; (b) claimed that Reeves was indebted to National for a large amount; and (c) that Reeves was not entitled to any stock ownership in National.

National moved to have a Master appointed to hear the testimony and bring in recommendations; but this was denied. In refusing to appoint a Master, the Chancery Court did not abuse its sound discretion. See *Drennan* v. *McCarthy,* 213 Ark. 286, 210 S. W. 2d 791, and cases there cited. The evidence was heard by the Chancery Court and resulted in a decree which:

I.   Rendered judgment in favor of Reeves for his services to National in the amount of ..................$15,000.00

II.   Rendered judgment for Reeves for office rent and stenographic services supplied by his office to National in the amount of ........................................................1,300.00

$16,300.00

III.   Deducted from Reeves' judgment the amount he owed National ........................................................................1,150.00 .

$15,150.00

IV.   Declared Reeves to be the owner of 2,483 shares of stock (par value $1.00 per share) in National by reason of original acquisition.

V.   Declared Reeves the owner of 5,000 additional shares in National (par value $1.00 per share); but credited the judgment against National with the par value of the said 5,000 shares ..........................................5,000.00

Leaving a net judgment in favor of Reeves against National of ........................................................................................$10,150.00

VI.   Refused to award Reeves any preemptive stock rights on the shares awarded him as previously mentioned.

From that decree, there is this appeal and cross-appeal; and we will discuss the issues by convenient reference to the points in the decree as numbered and listed in the tabulation above.

I.   *Reeves' Claim For Services.*   Beginning in August 1954, and continuing until May 1956, Reeves rendered services to National both as an attorney and as a business man.   There was no agreement as to the amount or method of determining compensation; but it is not claimed that Reeves' services were to be gratuitous.

National had been organized as an Arkansas corporation in 1953, and had some oil and gas leases on

unproven but potentially productive property in Louisiana; and most of the original stockholders appear to have been residents of that State. By August 8, 1954 National found itself out of funds and with stock outstanding of the face value of $65,700.00. Two of the stockholders on that date were Messrs. Boucher and Shackelford, who, together, owned $19,900.00 of the National stock. These two gentlemen last named sold to Messrs. Erbacher, O'Bannon, Porter, Roberts, Jackson, and Reeves, the entire $19,900.00 of stock for $4,975.00 (being 25 cents on the dollar) on condition that the purchasers would buy from any other dissatisfied stockholders any tendered stock in National at the same basis of 25 cents on the dollar of face value.

This transaction of August 1954 (subsequently to be referred to in Section IV herein) was the beginning of Reeves' connection with National. He became attorney for the Company, served as Vice-President, assisted materially in the sale of stock, and made numerous trips to Louisiana and other places. Sometimes he was accompanied by some of the other directors, and sometimes he was alone. Reeves a d v a n c e d substantial amounts of his own money to National, and rendered a variety of services.

Two of the wells drilled by National were nonproductive; but finally National brought in a good gas well on its holdings, so that the stock rose in value from 25 cents on the dollar to somewhat above par; and at the time of the trial below, National had a reasonably bright future. After the gas well became a producer, there arose dissatisfaction with Reeves' efforts: his services were discontinued, and all of the stock issued to him was declared cancelled. Thereupon Reeves filed this suit in September 1956.

Reeves had a most efficient secretary, who had worked in his office for many years. She kept for Reeves a daybook showing who was in Reeves' office in consultation with him every working hour of each working day. This book was offered in evidence, and the secretary testified to the correctness of the entries. From

this daybook, and other evidence in the record, the Trial Court found that Reeves had devoted a total of at least six hundred hours to the business of National, and that the reasonable value of such services was $25.00 per hour, or a total of $15,000.00. A former Chancellor and three members of the local bar testified as to Reeves' legal ability and the value of his time. Absent, as here, any contract concerning the method of determining compensation, the Trial Court adopted the "hours-spent" basis; and we find that this was fair and reasonable under the circumstances. See 7 C. J. S. page 1120 *et seq.*

Appellant argues that Reeves· was interested in three or four other oil companies and in several commercial ventures, and that part of the time he claims he devoted to National was, or might have been, devoted to some other company; and that the amount awarded was too large. The testimony for Reeves made out a case. The forces now opposed to him in the present suit were allied with him while he was rendering his services to National. These forces failed to show the Chancery Court that Reeves' witnesses and daybook were in error; and on this appeal, appellant has failed to establish to us that the chancery decree is in error on this phase of the case: so we affirm the award of $15,000.00 to Reeves for services rendered to National.

II. *The Rent and Stenographic Services.* For thirteen months National's other officers used Reeves' offices and telephone, and availed themselves of the services of his secretaries; and for this the Chancery Court allowed Reeves $100.00 per month, or a total of $1,300.00. The evidence supports this award.

III. *The Amount Reeves Owed National.* The Chancery Court found that Reeves owed National $1,-150.00; and Reeves concedes this to be correct; but National claims that the amount should have been $2,219.98. This difference of $1,069.98 arises because of some checks claimed by one party to be expenses and by the other to be advances. It would unduly lengthen this opinion to discuss the figures in detail. It is sufficient

to say that we hold that the $1,150.00 fixed by the Chancery Court is correct.

IV. *Reeves' Right to 2,483 Shares of Stock By Claim of Original Acquisition.* On this point, the Chancery Court was in error. We hold that Reeves is not entitled to the 2,483 shares. In Topic I, *supra,* we have heretofore recited (a) the incorporation of National in 1953, and (b) the August 1954 contract between Messrs. Boucher and Shackelford, as First Parties, and Messrs. Erbacher, O'Bannon, Roberts, Porter, Jackson, and Reeves, as Second Parties, concerning the sale of $19,-900.00 of stock in National from First Parties to Second Parties for $4,975.00 (25 cents on the dollar), provided Second Parties would also purchase the tendered stock of any other dissatisfied stockholders at the same price of 25 cents on the dollar. If the six Second Parties had sold 5,000 shares of this "Boucher-Shackelford Stock" at par (to repay the $4,975.00 original investment), they would have had still remaining 14,900 shares, which would have meant approximately 2,483 shares for each of the six Second Parties. It was on such basis of calculation that the Chancery Court awarded Reeves the 2,483 shares as an original acquisition.[1]

Now, if the six Second Parties had carried out their contract with Messrs. Boucher and Shackelford as the contract was written — that is, used their own funds as separate and distinct from the corporate funds — then each of the Second Parties would have been entitled to 2483 shares as an original acquisition. But the said six Second Parties did not carry out the contract distinct from the corporation. Instead, they used the corporation funds to finance the entire Boucher-Shackelford

---

[1]At one time the stock had a par value of $10.00 per share, but was later reduced to $1.00 per share; and that value of one dollar per share is used throughout this entire opinion. In issuing stock to the six Second Parties for the 14,900 shares, there was a mistake in calculation which could have been caused either by the change in par value or by the purchase of other dissatisfied stock on the basis of 25c on the dollar. At all events, originally, the amount of stock issued to each of the six Second Parties was 5,080 shares. This mistake in calculation was admitted by all parties; and in this opinion we have treated the stock issued as 2,483 shares to each of the Second Parties, which is conceded by all to be an approximately correct calculation.

transaction. The Second Parties had the corporation borrow $5,000.00 with which to pay Messrs. Boucher and Shackelford the original $4,975.00. Then the said Second Parties sold corporation stock at par to the general public and thereby the corporation received funds, some of which were available to be used in purchasing, at 25 cents on the dollar, stock of any other dissatisfied stockholders who acted under the option contained in the Boucher-Shackelford agreement of August 1954.

In short, the six Second Parties, after signing the Boucher-Shackelford agreement of August 1954, took over the directorship, management, and control of National, and used National and its funds with which to complete the Boucher-Shackelford agreement and acquire other stock at 25 cents on the dollar. Under such circumstances, the six Second Parties are considered in equity as having acted in the entire transaction for National, and not for themselves. In Fletcher's Cyclopedia on Corporations (Permanent Edition) Vol. III, § 1108, the holdings are summarized: "Purchases of corporate stock by corporate officers with corporate assets makes such officers trustees of the stock for the benefit of the corporation". While Erbacher, *et al.* were not directors at the inception of the Boucher-Shackelford contract, they appear to have taken over the directorships with the stock, and they caused National to borrow the money to pay for the purchased stock. The directors of a corporation occupy a fiduciary relationship to the corporation, and when they use the corporation's funds for purchases and acquisitions, then the resulting benefits belong to the corporation and not to the individual directors. Our own cases point to the rationale of this holding. *Red Bud* v. *South,* 96 Ark. 281, 131 S. W. 340; *Bank of Commerce* v. *Goolsby,* 129 Ark. 416, 196 S. W. 803; *Horner* v. *New South Oil Mill,* 130 Ark. 551, 197 S. W. 1163; *Taylor* v. *Gordon,* 180 Ark. 753, 22 S. W. 2d 561; *Fagan* v. *Stuttgart Normal,* 91 Ark. 141, 120 S. W. 404; and see also 19 C. J. S. 164.

There were six of the directors who received this Boucher-Shackelford stock. The other five (that is,

Messrs. Erbacher, O'Bannon, Roberts, Porter, and Jackson) recognized at a stockholders' meeting, on September 13, 1955, that the stock issued to them from the Boucher-Shackelford agreement should not be owned by them personally; and each of the five surrendered such stock to National; but Reeves refused to surrender his stock. We hold that he is bound by the same rules of law and equity that the other five recognized and followed; and that he should not be allowed to retain the 2,483 shares. Therefore, we reverse so much of the Chancery decree as allowed Reeves to retain the 2,483 shares.

V. *Reeves' Right to* 5,000 *Shares of Stock To Be Credited on His Judgment.* The situation regarding the 5,000 shares is different from that regarding the 2,483 shares; and the Chancery Court was correct in awarding the 5,000 shares to Reeves. At a meeting of the directors on February 4, 1955, the six directors (Messrs. Erbacher, O'Bannon, Roberts, Porter, Jackson, and Reeves) voted 5,000 shares of stock to each of themselves. The resolution recites: "All members voted unanimously 'aye'. Motion carried." It is elementary that directors cannot reward themselves in any such manner. *Oil Fields Corp.* v. *Hess,* 186 Ark. 241, 53 S. W. 2d 444; *Cook* v. *Malvern Brick Co.,* 194 Ark. 759, 109 S. W. 2d 451; and *Mortensen* v. *Ballard,* 218 Ark. 459, 236 S. W. 2d 1006. In the last cited case, we quoted from Vol. 14A of C. J. p. 143:

" 'An officer is without authority to fix or increase his own salary. Directors are precluded from fixing, increasing, or voting compensation to themselves for either past or future services by them as directors or officers, unless they are expressly authorized to do so by the charter or by the stockholders . . .' "[2]

When the stockholders of National learned of the action of the directors and disapproved such action, then each of the other five directors — except Reeves — voluntarily surrendered the 5,000 shares so issued. Reeves placed his 5,000 shares in escrow until his ac-

---

[2] The same textual statement is in 19 C.J.S. page 199.

count with National could be settled; and all the time he contended that National owed him more than the value of the 5,000 shares.

Of course, Reeves could not be allowed to keep the 5,000 shares as "bonus stock" issued by directors to themselves; but in equity he should be allowed to credit the value of the stock on whatever National owed him; and the credit should be at par value, even though the stock probably did not have such value at the time of issuance. It is not unusual in "wildcat" oil companies (such as National was at that time) for an attorney to receive his fee for services part in cash and part in stock. The Chancery Court recognized this fact in the decree which awarded Reeves the 5,000 shares and credited the par value of $5,000.00 on the judgment of Reeves against National. We hold that the Chancery decree in this respect accomplished substantial equity.

VI. *Reeves' Preemptive Rights on Stock Owned By Him.* This is one of the most perplexing phases of the case. At a stockholders' meeting, National voted to allow each shareholder to purchase additional shares on a *pro rata* basis of stock owned. Reeves tendered his check for $1,600.00 for the purchase of such additional stock; and it is tacitly conceded that if Reeves owned 5,000 shares of stock on that date, then the $1,600.00 is within the rights of preemption. National refused to receive Reeves' check for such purchase, claiming that all his stock had been cancelled. The Chancery Court awarded Reeves 5,000 shares of stock, as above recited, but held that Reeves was not entitled to exercise any preemptive rights; and on this issue Reeves has cross-appealed.

We hold that the Chancery Court was correct. Even though the 5,000 shares of stock had been originally issued to Reeves, it was in a "bonus stock" agreement by the directors and, as such, was void. It was not until the Chancery Court decree awarded Reeves 5,000 shares of stock and credited it on his fee that he became legally and equitably entitled to the stock; and by that time the period of exercising preemption for

purchase of additional stock had long since expired. We cannot say that Reeves was entitled to the 5,000 shares of stock during the time of the exercise of preemptive rights. He became entitled to the stock only when the Chancery Court determined such to be an equitable settlement of his fee; so the Court was correct in refusing to allow Reeves to exercise preemptive rights for $1,600.00.

## CONCLUSION

As herein stated, the decree is affirmed in part and reversed in part on direct appeal, and is affirmed on cross-appeal; and the cause is remanded to the Chancery Court, with directions to proceed in a manner not inconsistent with this opinion. All costs of both Courts are taxed against appellant.

MILLWEE and GEORGE ROSE SMITH, JJ., not participating.