**B. J. McADAMS, INCORPORATED**

v.

**Winston M. BOGGS, Hughes Refrigerated Express, Inc., David E. Green, R. V. Phillips, Ralph T. Stalnaker, Robert E. Taylor, J. C. Long, Hal G. Davis, Edward G. Jukes, John W. Moore, Edward M. Schlein, L. B. Carnes, and Doris Beasley.**

Civ. A. No. 75–3054.

United States District Court, E. D. Pennsylvania.

Nov. 3, 1977.

---

Peter Hearn, Patricia L. Freeland, Philadelphia, Pa., for plaintiff.

Tom P. Monteverde, Philadelphia, Pa., for defendants.

Michael J. Rotko, Philadelphia, Pa., for defendant Boggs.

## OPINION

LUONGO, District Judge.

This is a diversity action for breach of a fiduciary duty and diversion of a corpo-

rate opportunity. I disposed of various procedural motions in an earlier opinion. *See* 426 F.Supp. 1091 (E.D.Pa.1977). The case is now before me on a motion by some of the defendants for summary judgment under Federal Rule 56. As required in considering this motion, I shall assess the evidence in a light most favorable to plaintiff, the non-moving party. *See, e. g., Bishop v. Wood,* 426 U.S. 341, 347 n. 11, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

The plaintiff, B. J. McAdams, Incorporated, is a closely held Arkansas corporation engaged in interstate trucking. Its president and chief operating officer is Bob J. McAdams, who, with his former wife, are plaintiff's sole shareholders. The principal defendant, Winston M. Boggs, was an employee of plaintiff in 1974 and 1975.

This case centers around Boggs' purchase (for himself and some of the other defendants, rather than for plaintiff) of an Interstate Commerce Commission (ICC) certificate of public convenience and necessity authorizing certain interstate trucking in twenty-six Eastern states. The certificate had been owned by W. W. Hughes of Cornwells Heights, Pennsylvania. Boggs met Hughes in March 1974 while in Pennsylvania on business for plaintiff and, on plaintiff's behalf, made inquiries regarding purchase of the certificate. According to Bob McAdams, he and Boggs then undertook extensive, but unsuccessful, negotiations with Hughes regarding purchase of the certificate by plaintiff. Hughes died in February 1975, whereupon Boggs began conducting negotiations with the Hughes estate to purchase the certificate for himself. In May 1975, the estate accepted Boggs' purchase offer.

Rather than sell the certificate outright, the Hughes estate formed Hughes Refrigerated Express, Inc., a Pennsylvania corporation, having Mary Hughes, the estate's administratrix, as its sole shareholder, and sought ICC approval to transfer the certificate to the corporation. Once that approval was received and the transfer completed, the estate would sell all of the stock in Hughes Refrigerated Express. The stock sale, unlike sale of the certificate itself, would not require ICC approval.

While the ICC considered the application to transfer the certificate to Hughes Refrigerated Express, Boggs attempted to find other persons who would invest in the stock purchase. He offered this opportunity to David E. Green, a Haines City, Florida, physician, who, along with other potential investors from Haines City assembled by Green, met with Boggs in Florida in June 1975 to discuss the investment opportunity. Eleven Haines City residents— Green, Ralph T. Stalnaker, John W. Moore, Edward M. Schlein, Edward F. Jukes, J. C. Long, Hal G. Davis, Doris Beasley, R. V. Phillips, L. B. Carnes, and Robert E. Taylor (hereinafter collectively referred to as the investors)—agreed to join in the stock purchase. Financing was obtained through a loan from a local bank, Exchange Bank of Central Florida. The investors appointed Boggs as "Trustee or agent to represent [them] in the acquisition of the [Hughes Refrigerated Express stock]",[1] and on June 24, 1975, while in Philadelphia on business for plaintiff, Boggs, as "trustee," executed the agreement of sale with Mary Hughes and made a down payment.

On approximately August 22, 1975, the ICC approved transfer of the certificate to Hughes Refrigerated Express. Shortly thereafter, on August 25, 1975, the closing took place in Cornwells Heights, Pennsylvania. Boggs signed the closing documents for the investors and paid the balance of the purchase price. Hughes Refrigerated Express then set up its offices in Haines City, and on September 2, 1975, Boggs and the investors, as "all of the Shareholders and Directors" of Hughes Refrigerated Express, adopted a resolution ratifying the actions of their agents with regard to the August 25 closing.

In October 1975, plaintiff instituted this action against Boggs, the eleven investors, Hughes Refrigerated Express, and Ex-

1. The "trust agreement" setting forth this relationship was signed by Boggs in Pennsylvania on June 24, 1975 and by the investors in Florida on July 3, 1975.

change Bank of Central Florida.[2] As amended, the complaint alleges that Boggs breached a fiduciary duty owed to plaintiff and diverted plaintiff's corporate opportunity to acquire the ICC certificate and asserts that, as a result, Boggs and the investors hold the Hughes Refrigerated Express stock in constructive trust for plaintiff. The plaintiff demands transfer of the stock to it upon its payment of the purchase price, demands an accounting and payment to it of all profits generated from use of the certificate, and asks for damages. Plaintiff also sought to void the loan agreement with Exchange Bank, but the action against the bank was dismissed on February 14, 1977 for lack of personal jurisdiction. *See* 426 F.Supp. at 1096–97, 1102. The investors and Hughes Refrigerated Express (but not Boggs) have now moved for summary judgment.

### DISCUSSION

■ Summary judgment may be granted ". . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

The record in this case consists of twenty-one depositions and numerous documentary exhibits. Having surveyed this record, I have concluded that the first part of Rule 56(c)—requiring absence of material issues of fact—is dispositive of this motion. The Third Circuit has repeatedly emphasized the importance of a total absence of material factual issues. *See, e. g., Ettinger v. Johnson,* 556 F.2d 692, 696–97 (3d Cir. 1977); *Costlow v. United States,* 552 F.2d 560 (3d Cir. 1977). *See also Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 153–61, 90 S.Ct. 1598,

26 L.Ed.2d 142 (1970). Of course, the presence of factual issues will not bar summary judgment if they are not material to the controlling legal issues of the case. *Tarasi v. Pittsburgh National Bank,* 555 F.2d 1152, 1156 (3d Cir. 1977), *petition for cert. filed,* 46 U.S.L.W. 3054 (U.S., Aug. 4, 1977) (No. 77–195). But if the fact question is material, "[s]ummary judgment may not be granted where there is the slightest doubt as to the facts." *Tomalewski v. State Farm Life Insurance Co.,* 494 F.2d 882, 884 (3d Cir. 1974). I have concluded that the investors and Hughes Refrigerated Express (the moving defendants) have failed to meet this standard and that summary judgment therefore must be denied.

Recognizing that their liability is, in a sense, derivative of that of Boggs, the moving defendants have attacked plaintiff's case on two levels. First, they contend that on this record Boggs is not liable and that they cannot be found liable as a result. Second, they contend that, even if Boggs is liable, there is no basis for imposing liability on the investors or Hughes Refrigerated Express. I shall discuss each of these arguments in turn.

#### A.

The moving defendants assert that Boggs cannot be held liable for two reasons. First, they contend that Boggs was not under a fiduciary duty to plaintiff with regard to acquisition of the Hughes certificate. Second, they contend that at the time Boggs acquired the certificate for himself, acquisition of the certificate was not a corporate opportunity of plaintiff.

■ Boggs' fiduciary relationship to plaintiff, if any, must result from the nature of his employment with plaintiff. Since this is a diversity action, the substantive law governing that relationship—as well as that governing all other aspects of this case—must be determined in accordance with Pennsylvania choice-of-law rules. *See Klaxon Co. v. Stentor Electric Manu-*

---

**2.** The original complaint named as defendants Boggs, Hughes Refrigerated Express, Green, Jukes, Long, Davis, and Glenn C. Brown. On October 24, 1975, plaintiff filed an amended complaint which dropped Brown and added all of the other defendants.

*facturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Griffin v. McCoach,* 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481 (1941). Generally, those rules mandate that the substantive law of the jurisdiction predominantly concerned with a legal issue before the court should be applied to that issue. Jurisdictional concern is determined by a qualitative analysis of the contracts which each jurisdiction has with the transaction involved, focusing on the policies underlying each jurisdiction's laws with respect to that transaction and on the significance of each jurisdiction's factual contacts with the case insofar as they relate to the furtherance of that jurisdiction's legal policies. *See Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854 (1970); *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964); *Lenherr Estate,* 455 Pa. 225, 314 A.2d 255 (1974) (plurality opinion); *Suchomajcz v. Hummel Chemical Co.,* 524 F.2d 19, 23 (3d Cir. 1975). The Pennsylvania Supreme Court adopted this choice-of-laws approach in its 1964 *Griffith* decision, and application of this rule has been somewhat uneven in cases decided since that time. *See, e. g., Cipolla, supra.* Generally, however, the Pennsylvania analysis seems to be in accord with that of the Second Restatement of Conflict of Laws (1971). *See Suchomajcz, supra,* at 23. With respect to determining what fiduciary duties arise out of an employment relationship, the most significant contacts seem to be those of the jurisdiction where the employment relationship is centered. This is especially so when the employer is a corporation of the jurisdiction where the ongoing employment relationship was maintained. *See* Restatement (Second) of Conflict of Laws §§ 188, 221, 291, 309 (1971). Plaintiff is an Arkansas corporation with its principal place of business in Arkansas. Boggs entered into his employment relationship with plaintiff in Arkansas, and, throughout the period of his employment, he worked out of plaintiff's corporate headquarters in that state. I conclude, therefore, that Arkansas has the predominant jurisdictional concern as to Boggs' relationship to plaintiff and that Boggs' fiduciary duties thus should be determined in accordance with Arkansas law.

■ Arkansas imposes strict fiduciary duties upon corporate officers and directors. *See, e. g., Geominerals Corp. v. Grace,* 232 Ark. 524, 531–34, 338 S.W.2d 935, 940–41 (1960); *National Oil Co. v. Reeves,* 228 Ark. 664, 670, 310 S.W.2d 242, 246 (1958); *Mothershead v. Douglas,* 215 Ark. 519, 221 S.W.2d 424 (1949). *See also* Arkansas Business Corporation Act, Ark.Stat.Ann. § 64–308 (liability of directors in certain cases). As the moving defendants point out, however, Boggs was not an officer or director of plaintiff, but was merely a corporate employee. Recognizing that fact, plaintiff asserts that Boggs' fiduciary status with regard to acquisition of the Hughes certificate arises from the scope of Boggs' agency relationship to plaintiff. As a general rule, "[a]n agent is a fiduciary with respect to matters within the scope of his agency." Restatement (Second) of Agency § 13 (1958). As such, he "is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." *Id.* § 387. This relationship was explained by the Supreme Court of Arkansas in *Collins v. Heitman,* 225 Ark. 666, 672–73, 284 S.W.2d 628, 633 (1955):

> "[A]n agent, regardless of how innocent his intentions may be, cannot place himself in a situation where personal interests conflict with the duties owed his principal. In the recent case of *McHaney v. McHaney,* 209 Ark. 337 [346] 190 S.W.2d 450 [454] 162 A.L.R. 1175 [1180–81 (1945)] we said: 'Everyone, whether designated agent, trustee, servant or what not, who is under contract or other legal obligation to represent or act for another in any particular business or line of business or for any valuable purpose must be loyal and faithful to the interest of such other in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it. This is a rule of common sense and honesty as well as of law. The agent is not entitled to avail himself of any advantage that his position may give him to profit beyond the agreed compen-

sation for his services. He may not speculate for his gain in the subject-matter of the employment. He may not use any information that he may have acquired by reason of his employment, either for the purpose of acquiring property or doing any other act which is in opposition to his principal's interest.' "

■ The question is whether Boggs was "under contract or other legal obligation to represent or act for [plaintiff]" with regard to acquisition of the Hughes certificate. Apparently Boggs had no formal employment contract with plaintiff spelling out his duties and responsibilities. In his deposition testimony, Boggs admitted that he did play a minor role in the acquisition of trucking rights for plaintiff but contended that negotiation of such acquisitions was not part of his job. See Boggs Dep., pt. 1 (Doc. No. 82), at 28–29. On the other hand, Bob McAdams' deposition testimony ascribed to Boggs a much greater role in trucking rights acquisition, although McAdams did admit that Boggs was more intimately involved in the creation of new trucking rights requiring the issuance of new ICC certificates than in the purchase of existing trucking rights and ICC certificates from other motor carriers. See McAdams Dep., pt. 1 (Doc. No. 81), at 50–64. More important, however, McAdams testified that Boggs was not only under a duty to purchase ICC certificates in general, but that he was under a duty to purchase the Hughes certificate in particular and that he was instructed to conduct negotiations with Hughes toward achievement of that end. See id. at 145, 153–57, 161–65, 169–70. It is apparent that there is a factual dispute as to the scope of Boggs' employment responsibilities. If it was his responsibility to purchase the Hughes certificate for plaintiff and he instead purchased it for himself, he breached his fiduciary duty to plaintiff. Resolution of this question is for the factfinder at trial.

■ The moving defendants' second argument with regard to Boggs' liability is that, at the time Boggs acquired the Hughes operating rights for himself, that

acquisition was not a corporate opportunity available to plaintiff. The defendants argue that there can be no liability for breach of a fiduciary duty through diversion of plaintiff's corporate opportunity if plaintiff had no corporate opportunity to be diverted. See, e. g., Little Rock Towel and Linen Supply Co. v. Independent Linen Service Co., 237 Ark. 877, 880–83, 377 S.W.2d 34, 36–38 (1964). In support of their argument that plaintiff lacked a corporate opportunity at the time of Boggs' purchase, the moving defendants assert that (a) the Hughes would not have sold the certificate to plaintiff, (b) plaintiff was financially unable to purchase the certificate, and (c) plaintiff had abandoned its efforts to obtain the certificate before Boggs made the acquisition.

The first of these three assertions is based on testimony from members of the Hughes family (e. g., D. Hughes Dep. (Doc. No. 89), at 20–23) that they weren't interested in selling to plaintiff because they were worried about plaintiff's financial condition and preferred to sell to a party who was not already a motor carrier. Defendants concede (Defendants' Reply Brief (Doc. No. 108) at 5), however, that there is testimony in the record to the effect that W. W. Hughes was interested in plaintiff's offer to buy the certificate (see McAdams Dep., pt. 1 (Doc. No. 81), at 113–14). Material facts are in dispute on this issue.

As to plaintiff's financial ability to purchase the certificate, the record does show that plaintiff had financial difficulties. A major problem was the withdrawal of credit by Walter E. Heller & Co., which had been lending plaintiff money prior to 1974. On July 8, 1974, Heller gave plaintiff notice that it was terminating its financing arrangements, but it repeatedly postponed the date of termination and eventually—in the summer of 1975 (at about the time Boggs was negotiating purchase of the certificate for himself)—formally agreed to enter into a new financing arrangement with plaintiff. McAdams Dep., pt. 2 (Doc. No. 105), at 233–46. The moving defendants' contention is that plaintiff's financial

condition was so grave that plaintiff was incapable of purchasing the Hughes certificate. Funds for the purchase might have been obtained in a variety of ways, however—e. g., by borrowing from various lending institutions or through sale of stock or debt instruments. It can hardly be said that this record conclusively establishes that plaintiff was totally unable to obtain financing from any source, and I shall not grant summary judgment on this issue.

The question whether plaintiff abandoned its efforts to secure the Hughes certificate is hotly disputed. Bob McAdams testified that he gave Boggs a major role in the negotiations because, "Well sometimes people, different people can get things done." McAdams Dep., pt. 1 (Doc. No. 81), at 146. He assumed that Boggs was talking to the Hughes family on plaintiff's behalf. *See id.* at 157–64. Nevertheless he himself called the Hughes on several occasions during 1975. *Id.* at 165–66 (April phone call), 170–72 (July phone call), 178–82 (August phone call). At the very least, McAdams' testimony creates a material issue of fact as to abandonment.

This record contains sufficient factual disputes with regard to Boggs' liability to preclude summary judgment. The moving defendants' contention that they cannot be found liable because Boggs is not liable must be addressed to the fact-finder at trial.

### B.

Proceeding to the second tier of their argument, the moving defendants contend that there is no basis for imposing liability on them even if Boggs is liable. In their view, the only possible basis for liability is tortious interference with contractual relations, a theory under which, they assert, plaintiff could not recover against them because they had no knowledge of the alleged contractual expectancy between plaintiff and the Hughes. *See generally* Restatement of Torts § 766 & Comment e (1939); Restatement (Second) of Torts §§ 766–774B (Tent. Draft No. 23, 1977); *Mason v. Funderburk,* 247 Ark. 521, 446 S.W.2d 543 (1969); *Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895 (1971).[3] In arguing against this motion, however, plaintiff has not relied on a tortious interference with contract theory. Instead, plaintiff relies on principles of agency and restitution.

Under the agency theory, plaintiff contends that Boggs diverted the Hughes certificate while acting as agent for the Florida investors and that, as a result, the investors are vicariously liable for Boggs' allegedly wrongful acts. The agency relationship to which plaintiff refers arose in the summer of 1975 when the investors and Boggs executed a "trust agreement" by means of which the investors appointed Boggs as their "Trustee or agent" in acquiring the Hughes Refrigerated Express stock.[4] Because Florida was the state in which the trust agreement was drafted by the investors' attorney and executed by the investors, and because Boggs was required to transfer the Hughes stock to the investors when he returned to Florida, plaintiff contends that Florida law governs the agency relationship under the Pennsylvania choice-of-law principles discussed above. Insofar as the place of formation of the agency contract is a significant jurisdictional contact for choice-of-law purposes as to this aspect of the case, I note that Boggs executed the trust agreement in Pennsylvania, not Florida. I do not believe

---

**3.** Because plaintiff has not advanced the tortious interference with contractual relations theory, I need not and do not decide which state's law governs analysis of that tort. I note, however, that Arkansas, the state of plaintiff's principal place of business, and Pennsylvania, the state of Boggs' allegedly wrongful conduct and situs of some of the business lost by plaintiff as a result of that conduct, are prime candidates. *See generally*

Restatement (Second) of Conflict of Laws § 145.

**4.** I note that Boggs may have taken on the duties of agent before the trust agreement formally went into effect. On June 24, 1975, Boggs signed the closing documents as "trustee" for the investors. The investors did not execute the trust agreement until July 3, 1975.

that the place of contract formation carries much weight here, however. The controlling question with regard to plaintiff's agency theory of recovery does not involve matters of the trust agreement's formation or validity. Rather, the question is what liability may be imposed on the investors as principals under the agency relationship which has arisen. In this situation, I agree with Comment *f* to § 291 of the Second Restatement of Conflict of Laws that, of the various applicable contacts, "that which will usually be of greatest importance is the place, if such a place exists, where under the provisions of the agreement the agent is to act, or principally to act, in the principal's behalf." A state in which allegedly wrongful conduct is committed under an agency agreement has an important interest in determining the liability of persons responsible for that wrong. *Cf.* Restatement (Second) of Conflict of Laws §§ 145, Comment *e* (torts), 205, Comment *c* (nature and extent of contractual obligations). By authorizing his agent to act within that state, the principal establishes a relationship with the jurisdiction which allows him to be subject to its local law. *See id.* §§ 174, Comment *c* (vicarious liability), 292 (principal's contractual liability in dealings with third persons), 293 (principal's ratification of agent's acts). Under his agreement with the investors, Boggs' primary duty was to act in Pennsylvania to acquire the Hughes stock for the investors. For that reason, I believe that Pennsylvania law controls this aspect of the case.[5]

Plaintiff makes a number of arguments in support of its agency theory. First, plaintiff relies on the general rule that a principal is liable for the acts of his agent even though those acts are fraudulent as to third persons. *See, e. g., Bachman v.*

*Monte,* 326 Pa. 289, 295–96, 192 A. 485, 487–88 (1937). This rule is summarized in § 261 of the Second Restatement of Agency:

"A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."

The Restatement rule, in the identical wording of the first Restatement of Agency, was quoted with approval in *Bachman, supra,* at 296, 192 A. at 488, and *Gordon v. Continental Casualty Co.,* 319 Pa. 555, 562, 181 A. 574, 576 (1935). Comment *a* to the section explains—

"The principal is subject to liability under the rule stated in this Section although he is entirely innocent, has received no benefit from the transaction, and . . . although the agent acted solely for his own purposes. Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him."

*See also* Restatement (Second) of Agency § 262.

Under this view, the investors are absolutely liable for Boggs' allegedly wrongful conduct regardless of whether they knew Boggs was breaching his duty to plaintiff.

Aside from this general rule, plaintiff relies on provisions of the Second Restatement of Agency which deal with an agent's acquisition of property for his principal. Section 263 provides:

---

**5.** Although I believe that the investors' liability under the agency theory is governed by Pennsylvania law, I do not perceive any difference between the law of Pennsylvania and Florida on this matter. The law of each of these states seems to be in accord with the Second Restatement of Agency on the issues presented in this case. *See, e. g., Industrial Ins. Co. v. First Nat. Bank,* 57 So.2d 23, 26 (Fla.1952) (adopting Restatement of Agency § 261); *Rich v. Hunter,* 147 Fla. 724, 732, 3 So.2d 393, 396 (1941) (applying principles similar to Restatement (Second) of Agency § 274); *Chase v. Sullivan,* 99 Fla. 202, 204–05, 126 So. 359, 360 (1930) (application of restitution concepts to principal in agency relationship); *Connelly v. Special Road & Bridge Dist. No. 5,* 99 Fla. 456, 473, 126 So. 794, 800 (1930) (applying rule similar to Restatement (Second) of Agency §§ 279, 282).

"Unless he has changed his position, a principal whose servant or other agent has fraudulently acquired property for him, holds it subject to the interests of the defrauded person. If the principal is liable in tort for the fraud of the agent, his change of position after acquiring the property is not a defense."

*Accord, Meyerhoff v. Daniels*, 173 Pa. 555, 34 A. 298 (1896).

Comment *a* to § 263 explains:

"The rule stated in this Section is one of the consequences of the rule stated in Section 259 by which the other party to a transaction in which he was defrauded by an agent is entitled to its rescission. As long as the third person is entitled to rescission, the principal holds things acquired as a result of the transaction as a constructive trustee for him. See the Restatement of Restitution, Section 28. If the one who acquired the property purported to act as agent, the principal ratifies the transaction, including the misrepresentation, if he knows the facts when he acquires the property or if he learns the facts before changing his position and does not return it. See §§ 98 and 99."

The section on which plaintiff primarily relies is § 274, which, along with pertinent explanatory comments, provides:

"§ 274. Agent Acquiring Property for Principal

The knowledge of an agent who acquires property for his principal affects the interests of his principal in the subject matter to the same extent as if the principal had acquired it with the same knowledge, except where the agent is privileged not to disclose or to act upon the knowledge, or a change in conditions makes it inequitable thus to affect the principal.

Comment:

*a.* A person cannot properly retain property which has been acquired for him by fraud or other unlawful means. See §§ 99 and 263. So also, if the agent acquiring property for the principal knows of the existence of an equitable interest of a third person in the subject matter, the principal takes it subject to the interests of the third person, since, as to such person, the acquisition is wrongful, See the Restatement of Restitution § 208. For this wrong the remedy is normally the surrender of the thing thus acquired, but it may extend to a liability for its proceeds (see the Restatement of Restitution §§ 202–215), or, as against an intentional wrongdoer, liability for the tortious act of interfering with the interests of the equitable owner. See the Restatement of Torts, § 871.

*b. Change of position.* The rule stated in this Section is not primarily a rule of agency, but of restitution. The prima facie liability of the principal exists because of unjust enrichment. If the property is obtained by conduct for which the principal is not responsible, he is protected by a change of position. On the other hand, if the agent was guilty of tortious conduct for which the principal was responsible, a change of position is no defense. Thus, if the principal is liable for the fraud of the agent upon the other party (§§ 257, 258 and 261), the defrauded third party is entitled to regain his property, irrespective of any loss which this would occasion the principal. If an agent buys for his principal property in which, as the agent knows, another has an equitable interest, and the principal pays the agent in ignorance of the interest, the principal holds the property subject to a constructive trust, if, but only if, he was liable for the agent's tort in acquiring the title. If the agent in acquiring the property, although intending to purchase it for the principal, was acting wholly for his own purposes, as where he was bribed by the legal owner not to reveal the equitable interest, the payment in ignorance of the facts is a defense to the principal. See §§ 259(2), 263, 282(1)."

The basic rule of § 274 was adopted by the Pennsylvania Supreme Court in *Heilig Bros. Co. v. Kohler*, 366 Pa. 72, 79, 76 A.2d 613, 617 (1950). Under this section, plaintiff contends that Boggs' knowledge that

the Hughes certificate was a corporate opportunity of plaintiff is imputed to the investors and makes them liable to plaintiff.

Although vicarious liability is plaintiff's primary basis for imposing liability on the investors for Boggs' conduct, plaintiff argues in the alternative that the investors had sufficient knowledge of Boggs' responsibilities to plaintiff with respect to this transaction to make them directly liable to plaintiff. Of course, if the investors knew that Boggs was under a duty to acquire the certificate for plaintiff and proceeded nevertheless to aid Boggs in diverting the certificate and sharing the property with them, the investors would be jointly liable with Boggs for the harm caused to plaintiff. It is obvious that the policy considerations favoring imposition of liability on a principal under § 261 of the Second Restatement of Agency, *supra*, are much stronger where the principal knows of the agent's wrongdoing and nevertheless places him in a position to carry his wrongful scheme to fruition.

In the face of these contentions, the investors argue that they cannot be held vicariously liable because Boggs acquired the Hughes certificate for himself rather than for them. They note that Boggs negotiated and reached a tentative purchase agreement with the Hughes in early 1975. The investors did not become involved until after that agreement had been reached and Boggs was seeking financing for the purchase. Boggs implicated the investors for the purely personal motive of financing his purchase, and, in exchange for providing them with an investment opportunity, he was given a portion of the Hughes Refrigerated Express stock and an employment contract with the corporation. Thus, the investors argue, when Boggs acquired the Hughes stock and certificate he acted primarily for his own purposes and not as agent for the investors. They rely on the statement in Comment *b* to § 274 of the Second Restatement of Agency that "[i]f

the agent in acquiring the property, although intending to purchase it for the principal, was acting wholly for his own purposes . . . , the payment in ignorance of the facts is a defense to the principal." They also rely on § 279 of the Second Restatement of Agency, which, along with Comment *a* thereto, provides:

"§ 279. Agent Dealing with Principal as Adverse Party

The principal is not affected by the knowledge of an agent as to matters involved in a transaction in which the agent deals with the principal or another agent of the principal as, or on account of, an adverse party.

Comment:

*a.* If, in the particular transaction, the person who has knowledge, although an agent in other matters, is not acting or purporting to act on account of the principal, but is acting for himself or for some other person, the principal is not affected by such knowledge. The rule stated in this Section applies to situations in which the agent is known to be acting as an adverse party and hence has no duty to the principal growing out of the fiduciary relation between them, except not to use the relation as a means of cheating the principal. This situation should be distinguished from that in which an agent transfers property to the principal without the latter's knowledge. See § 274, Comment *c*."

Under these provisions, the investors contend that Boggs' knowledge of his fiduciary duty to plaintiff cannot be imputed to them and that they can only be found liable if they had actual or constructive knowledge of Boggs' alleged wrongdoing.[6] On that issue, they contend that the record establishes that they had no such knowledge and that they thus are entitled to summary judgment.

■ The basic facts with regard to acquisition of the Hughes certificate are not

---

**6.** The investors have not contended that only actual (rather than constructive) knowledge can form the basis for imposing liability. *See generally Custis v. Serrill*, 303 Pa. 267, 270, 154

A. 487, 488 (1931); *Cameron v. Peoples' Bank of Maytown*, 297 Pa. 551, 556–57, 147 A. 657, 659 (1929); Restatement (Second) of Agency § 9.

in dispute. Boggs did desire to acquire the certificate for himself and negotiated with the Hughes on his own behalf. Boggs could not afford to make the purchase by himself, however, and he therefore convinced the investors to make the purchase and to give him a portion of the stock as consideration for finding the investment opportunity. As set forth in ¶ 5 of the trust agreement (Carnes Ex. No. 1, Doc. No. 114, Tab 1, & Doc. No. 2, Tab 9), Boggs acquired forty percent of the Hughes Refrigerated Express stock and the investors received the remaining sixty percent. *See also* Capitalization Agreement ¶ 2, Phillips Ex. No. 8, Doc. No. 107, Tab 8. Despite the fact that Boggs may have been motivated by a desire to personally own the Hughes certificate, the ultimate result was that Boggs had to share ownership with the investors. When he signed the documents formalizing the stock transfer, he did so both on his own behalf—as an acquirer of forty percent of the stock—and as agent for the investors in acquiring their sixty percent. Obviously, whatever agreement Boggs reached with the Hughes before convincing the investors to make the purchase was of no legal significance; the stock transfer did not take place until the closing, to which the investors—through Boggs, their agent—were parties. On these facts, I cannot say that Boggs was acting primarily for his own purposes when he executed the documents which accomplished the stock transfer.

█ The investors did not merely lend Boggs money with which he could purchase the stock; they became actual purchasers themselves, using Boggs as their agent. Since he was acquiring sixty percent of the stock for the investors, Boggs was not "acting wholly for his own purposes" within the meaning of Comment *b* to § 274, *supra.* Section 279, on which the investors so heavily rely, only applies to situations in which a person who is the principal's agent in certain matters is not acting as agent (and indeed is acting as an "adverse party" to the principal) in a transaction between that person and the principal. *See* Reporter's Notes to § 279, 3 Restatement (Second) of Agency (Appendix) 478–79. The stock purchase was not a transaction between Boggs and the investors, and § 279 therefore seems inapplicable. The more pertinent section of the Second Restatement appears to be § 282(1), which states:

"A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes . . .."

This rule, which is subject to certain enumerated exceptions, is well established in Pennsylvania. *See, e. g., Commonwealth ex rel. Miller v. Doak,* 352 Pa. 380, 385, 42 A.2d 826, 829 (1945); *Sisney v. Diffenderffer,* 323 Pa. 337, 344–45, 185 A. 830, 834 (1936); *Gordon v. Continental Casualty Co.,* 319 Pa. 555, 181 A. 574 (1935). As I have stated, however, although he would personally benefit from the transaction, Boggs was not acting solely for his own purposes. In addition, I can hardly say that Boggs acted "adversely" to the investors when, by his actions, he acquired for the investors sixty percent of Hughes Refrigerated Express stock. *See* § 282, Comment *c.* Since §§ 279 and 282, as well as the quoted language in § 274, Comment *b,* are inapplicable, it appears that Boggs' knowledge of his wrongful conduct may be imputed to the investors under basic principles of agency law as expressed in the Second Restatement of Agency and adopted in Pennsylvania. If this is so, the investors' actual or constructive knowledge need not be proven to impose liability on them. It also appears that, *under such agency rules as that of § 261 of the Second Restatement, the investors may be held vicariously liable without regard to their knowledge of the wrongfulness of Boggs' conduct* and regardless of whether that knowledge is imputed or not.

I have engaged in this discussion of the vicarious liability and imputed knowledge issues because counsel for the moving defendants has requested that I make a definitive ruling on these issues at this time. Having made these observations, however, I decline to render a final decision on these matters. Instead, I shall afford counsel the opportunity to advocate their positions on

these issues at trial. With regard to this motion for summary judgment, I have concluded that if, as the moving defendants contend, plaintiff must prove that the investors had actual or constructive knowledge of Boggs' breach of his fiduciary duty, there is a sufficient factual dispute on that issue to foreclose summary judgment at this time.

The record discloses that on June 15, 1975, Green introduced Boggs to potential investors Phillips, Stalnaker, Taylor, Long, Davis, Jukes, Moore, and Carnes at a meeting in Florida. An attorney for the potential investors was present at the meeting. The attorney questioned Boggs as to his employment relationship with plaintiff and any restrictions that he might be under as a result of that relationship which would prevent him from working with the investors. Green Dep., pt. 2 (Doc. No. 71), at 579–80, 585–90; Boggs Dep., pt. 1 (Doc. No. 82), at 64–65; Wharton Dep. (Doc. No. 75) at 1077–78. According to the attorney, Boggs replied that he was under no restrictions which would prohibit him from undertaking a managerial position with Hughes Refrigerated Express. Wharton Dep., supra, at 1078. Although at the meeting Boggs stated that he was instrumental in obtaining additional trucking rights for plaintiff (Green Dep., supra, at 587), Boggs apparently was not asked whether he was under any obligation to plaintiff with regard to obtaining the Hughes certificate.

On June 19, 1975, the investors borrowed money from Exchange Bank of Central Florida to finance the purchase. See Phillips Ex. No. 6, Doc. No. 107, Tab 6. Although Boggs was not a party to the loan, the bank decided to run a credit check on him. See Carver Dep. (Doc. No. 68) at 389–92. See also id. at 354–59. When Green asked Boggs for information to give to the bank for this credit check, Boggs requested that his employment with plaintiff not be investigated. Green testified that, although Boggs did not state the reasons for this request, he (Green) inferred that it was because Boggs feared losing his job. Green Dep., pt. 2 (Doc. No. 71), at 749–50. Green so informed the bank. Car-

ver Dep., supra, at 394–96. When asked about the request at his deposition, Boggs testified as follows:

"Q. * * *

Now, did you make such a request?
A. Yes, I did.
Q. And why?
A. Because if Bob [McAdams] knew I was going to leave, then he would find out why I was going to leave, and then he would have tried to find a way to stop the sale of the authority.
Q. Did you tell Dr. Green that?
A. Maybe not in those words, but I thought he would do everything he could to keep me from leaving up there.
Q. You told him you didn't want him contacted because Mr. McAdams would have done everything he could to keep you from leaving?
A. Right."

Boggs Dep., pt. 1 (Doc. No. 82), at 74.

On August 8, 1975—after the June 24 signing of the agreement of sale but before the August 25 closing—Boggs told Bob McAdams that he planned to buy the Hughes certificate for himself. McAdams Dep., pt. 1 (Doc. No. 81), at 174–77; Boggs Dep., pt. 1 (Doc. No. 82), at 74–75. Through an employee, McAdams then attempted to discuss the matter with the Hughes, and, on August 12, McAdams personally had a telephone conversation with one of the Hughes about the certificate. While in the midst of this discussion, McAdams interrupted the conversation to receive a telephone call from Boggs, who then told McAdams that he had bought the Hughes authority. In response, McAdams threatened to sue. McAdams Dep., supra, at 177–82; Boggs Dep., supra, at 75–76. Boggs then called Green and told him "that there might be a possibility of a lawsuit." Boggs Dep. at 75. He was questioned by the investors' attorney about this possibility. See id. at 76–81.

On September 2, 1975, an employee of plaintiff called defendant Stalnaker and threatened him with suit as a result of the Hughes transaction. Stalnaker referred

the employee to the investors' attorney. McAdams Dep., pt. 1 (Doc. No. 81), at 189–91. The employee then called that attorney and explained that plaintiff had superior rights to the Hughes authority. *Id.* at 193–94; Fields Dep., pt. 2 (Doc. No. 74), at 973–75, 978–82. The attorney advised the investors that he did not believe the employee and that in any event, "the [die] had been cast." Fields Dep. at 982–85. On that same day, the investors, with Boggs, passed a shareholders' and directors' resolution ratifying the prior acts performed with regard to acquisition of Hughes Refrigerated Express. Certificate of Unanimous Consent, Doc. No. 63, Tab 45.

These events, which have been related in a manner favorable to plaintiff because plaintiff is the non-moving party on this motion, are cited by plaintiff to show that the investors had actual or constructive knowledge of Boggs' wrongdoing. The moving defendants dispute this conclusion and seek to draw certain inferences favorable to their point of view. They argue, for example, that Boggs' statements at the June 15 meeting only informed the investors of his role in creating new trucking rights rather than in purchasing existing rights; that Boggs' request with regard to the bank's credit check was not sufficient to create any suspicion of wrongdoing and was fully understandable as a means of avoiding his employer's possible retaliation for his desire to seek a new job; and that the "possibility of a lawsuit" to which Boggs referred in early August was only a suit against Boggs for terminating his employment with plaintiff. They also suggest that knowledge acquired by the investors after execution of the agreement of sale (and certainly after the closing) cannot be used to impose liability since the investors were already contractually bound with regard to the transaction. Since this is a motion for summary judgment, however, I must give plaintiff, the non-moving party, the benefit of all inferences. Viewing the evidence in that light, it certainly cannot be said that there would be no basis on which the fact-finder could find in plaintiff's favor on the question of the investors' knowl-edge. The moving defendants have cited no authority for the proposition that knowledge acquired after the investors became contractually bound cannot be considered in determining the investors' liability. Perhaps the moving defendants are referring to equitable principles regarding bona fide purchasers. The question is unclear and therefore should be left for determination at the time of trial. At this point, I need only say that, even viewing only those events which occurred prior to execution of the agreement of sale, there are sufficient facts from which the fact-finder could at least conclude that the investors should have inquired further into the nature of Boggs' relationship with plaintiff and obligations to plaintiff with regard to acquisition of the Hughes certificate and that the investors therefore should be charged with constructive notice of Boggs' wrongdoing. Admittedly, the inferences favoring this conclusion are not strong, but, for purposes of summary judgment, they are sufficient.

■ As the comments to some of the above-quoted sections of the Second Restatement of Agency make clear, many of plaintiff's agency theory arguments are based on equitable principles of restitution. Plaintiff's agency theory forms the basis not only for plaintiff's claim to the Hughes certificate, but, especially insofar as it imposes vicarious liability on the investors for Boggs' conduct, for a judgment against the investors for damages as well. Wholly apart from principles of agency, however, plaintiff asserts that it has a separate right to the Hughes certificate and all profits generated by it as a matter of equity, contending that the certificate is impressed with a constructive trust in its favor. I believe that the substantive law governing this restitution issue is that of Pennsylvania. Although, as discussed above, Boggs' fiduciary duty to plaintiff arose under Arkansas law and that law thus may govern Boggs' breach of his duty (Restatement (Second) of Conflict of Laws § 221, Comment *d*, Illustration 2), the issue under consideration on this motion is the liability of the investors, not that of Boggs. The in-

vestors were third parties having no prior relationship with plaintiff. In this situation, the most significant contacts with regard to this transaction are those of the place where the investors acted to receive and actually did receive the certificate—Pennsylvania. Restatement (Second) of Conflict of Laws § 221 & Comment *d*. It was in Pennsylvania that the stock purchase agreement was consummated. *See also B. J. McAdams, Inc. v. Boggs*, 426 F.Supp. at 1103 & n. 17.

■■■■■ Under Pennsylvania law, if Boggs was under a duty to acquire the certificate for plaintiff and he instead acquired it for himself, he is deemed to hold the certificate in constructive trust for plaintiff. *Shannon v. Baltz*, 398 Pa. 431, 158 A.2d 558 (1960). *See also Smith v. Unemployment Compensation Board of Review*, 28 Pa.Cmwlth. 98, 101–03, 367 A.2d 811, 813 (1977). If third persons who are not bona fide purchasers for value acquire property from a fiduciary who has breached his duty to the beneficiary in the manner Boggs is alleged to have done, they also are deemed to hold the property in constructive trust. *Higgins v. Shenango Pottery Co.*, 279 F.2d 46, 52–54 (3d Cir.) (applying Pennsylvania law), *cert. denied*, 364 U.S. 899, 81 S.Ct. 232, 5 L.Ed.2d 193 (1960); Restatement of Restitution §§ 201(1), 172 (1937). The investors contend that they are bona fide purchasers for value and thus are not subject to the latter rule. It is conceded that the investors purchased the Hughes stock for value, and, in doing so, acquired sixty percent of Hughes Refrigerated Express, the owner of the ICC certificate. Whether the purchase was "bona fide" depends on whether they had notice of plaintiff's superior rights to the Hughes certificate. *See* Restatement of Restitution § 172, *supra*. This aspect of the case is similar to plaintiff's claim under the agency theory when shorn of the principles of vicarious liability and imputed knowledge. As already discussed, whether the investors

were on notice of Boggs' wrongdoing is a question of fact which cannot be resolved on this motion for summary judgment.

Although most of the argument on this motion and most of the discussion in this opinion has related to the investors' liability, the summary judgment motion has also been made by Hughes Refrigerated Express. When the corporation made such a motion [7] earlier this year, I denied it, explaining:

". . . Hughes is now owned and managed by Boggs and the investors, who, in their capacity as shareholders and directors, have formally ratified their acquisition of Hughes and its ICC certificate. Hughes has thus been officially linked to this allegedly wrongful transaction. More important, Hughes, under the ownership and management of Boggs and the investors, continues to profit from the use of the ICC certificate. For these reasons, plaintiff has named Hughes as a defendant and demanded such relief as an accounting and relinquishment of all profits traceable to the certificate.

Under these facts, I cannot say that plaintiff has failed to state a claim against Hughes upon which relief can be granted and that Hughes is therefore entitled to a judgment as a matter of law. Hughes relies upon *Gibson v. Cannon*, 325 F.Supp. 706 (E.D.Pa.1971), but, unlike the moving party in that case, Hughes is not an independently owned third party which played only an incidental role in the facts alleged. Instead, Hughes was intricately involved in the transaction at issue and remains the owner of the property whose takeover is in dispute."

426 F.Supp. at 1106 (footnote omitted). Relying on Restatement of Restitution §§ 172 and 176(2), (3), the corporation now contends that the investors were bona fide purchasers of the sixty percent of the Hughes stock and that Boggs' misconduct with regard to the investors gave them a superior entitlement to Boggs' forty per-

---

7. The corporation's earlier motion was to dismiss under Federal Rule 12(b)(6), but, because affidavits, depositions, and other matters outside the pleadings had been made part of the record, I treated the motion as one for summary judgment. 426 F.Supp. at 1105.

cent of the Hughes stock. The corporation asserts that these facts fully divorce it from any possible liability to plaintiff and that it therefore is entitled to summary judgment.

As I have already stated, whether the investors were bona fide purchasers and therefore not subject at least to equitable liability to plaintiff is a question of fact to be determined at trial. The corporation's more sophisticated argument concerns its forty percent ownership by Boggs and is based on Restatement of Restitution § 176, which provides:

"(2) Where a person holding property upon a constructive trust transfers it to a bona fide purchaser and subsequently reacquires it from the purchaser under circumstances giving rise to a constructive trust for the purchaser, the purchaser is entitled to the property.

(3) If in such case the property is thereafter retransferred to the beneficiary of the original constructive trust, he can retain it if he himself is a bona fide purchaser or has so changed his position as a result of the transfer that it would be inequitable to compel him to surrender the property."

Cf. Estate of Lafferty, 181 Pa. 51, 37 A. 113 (1897) (applying similar principles). The corporation contends that, if Boggs was acting wrongfully, he defrauded the investors as well as plaintiff since he convinced the investors to purchase the Hughes stock and give some of it to him through false representations about his relationship with plaintiff and his duties with regard to acquisition of the certificate. The corporation further contends that Boggs therefore held his forty percent of Hughes stock in constructive trust for the investors and that, under § 176(2), the investors are entitled to that property. With respect to § 176(3) of the Restatement, the corporation argues that, as between plaintiff and the investors, the investors have the superior equitable interest in the property both because of Boggs' misrepresentations to them and because Boggs breached his agreement to manage the corporation by resigning in February 1976 and proposing transfer of his stock to plaintiff despite the investors' and Hughes' rights of first refusal.

The event which the corporation claims gave rise to a constructive trust in the investors' favor under § 176(2) is merely the fact that Boggs was breaching his fiduciary duty to plaintiff without telling the investors about it. If that fact could be used to circumvent plaintiff's right to obtain property wrongfully diverted from it, it would create an exception which in this case would swallow the normal rule. Although the investors may be bona fide purchasers entitled to keep their sixty percent of Hughes stock, plaintiff certainly has a superior right to obtain the forty percent acquired by Boggs through the alleged breach of his duty to plaintiff. Boggs would not have "defrauded" the investors if he had not been breaching his fiduciary duty. Given this situation I again conclude that Hughes Refrigerated Express is not entitled to summary judgment since it owns and is profiting from the ICC certificate and since it is owned by parties whose liability is still very much in dispute.

### C.

The record in this case contains an abundance of material factual issues, both with regard to Boggs' liability and that of the investors and Hughes Refrigerated Express. The moving defendants' motion for summary judgment therefore will be denied.