**TREASURE SALVORS, INC., a Florida corporation, Plaintiff,**

v.

**The UNIDENTIFIED, WRECKED AND ABANDONED SAILING VESSEL, et al., Defendant.**

**Robert JORDAN, Plaintiff,**

v.

**The UNIDENTIFIED, WRECKED AND ABANDONED SAILING VESSEL, et al., Defendant.**

Nos. 79–1381–Civ–JLK, 80–1205–Civ–JLK.

United States District Court, S.D. Florida.

Jan. 18, 1983.

David Paul Horan, Key West, Fla., for plaintiff.

Michael T. Callahan and Ronald W. Brooks, Brooks, Callahan & Phillips, Tallahassee, Fla., Gerhardt Schreiber, Linwood Anderson, Smathers & Thompson, Miami, Fla., for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, District Judge.

The ultimate fate of the SANTA MARGARITA, a royal galleon of the Spanish Tierra Firme Flota of 1622, is the subject of this opinion.

As this magnificent six hundred thirty ton galleon cleared Havana Harbor on Sunday, September 4, 1622, she carried one hundred eighty-eight persons on board, one hundred forty-three of whom sailed to a rendezvous with death in the tragedy to follow.

The SANTA MARGARITA also carried a treasure of gold and silver ingots, bars, disks, coins, chains and precious jewelry of such magnitude as to be almost beyond the imagination of modern man.

**1322**

## 1. FINDINGS OF FACT

### THE SHIPWRECK

The drama that unfolded during the trial of this case commenced on a clear and beautiful day 360 years ago. Dr. Eugene Lyon[1] described it thusly in *The Search for the Atocha:*[1]

"Sunday, September 4, 1622. Slowly and majestically, flying all their flags, the ships of the combined fleets passed one at a time by El Morro at the Havana harbor entrance. With Guard Fleet galleons and escorts, Tierra Firme vessels and small craft, twenty-eight ships filed out into the open sea. They sailed a good six weeks behind schedule.

"At dawning the day had been so serene, so clear, that Lorenzo Vernal and the other pilots had unanimously recommended that the fleet sail. If the morning before the conjunction of September were so fair, what possible danger could the next day bring? When he heard the pilot's recommendation, the Marquis of Cadereita felt reassurance, but still he hesitated. At last, the decision had to be made; he determined that the fleet had to sail. Too much was at stake, at home and abroad, to do otherwise. At seven in the morning, the Marquis had given the order to weigh anchor.

"It took more than an hour for all the ships in the unwieldy convoy to clear the port and form into sailing order. Then the Guard Fleet capitana led off on a north-north-west course. As almiranta of the Tierra Firme ships, the Atocha brought up the rear of its fleet. Having gotten safely offshore by midafternoon, the fleet then tacked to the eastward of Havana to enable the ships to sail easily northward with the wind to the lower Florida Keys. There, where the current was strongest, the fleet would enter the Gulf Stream, which would boost them strongly homeward.

"At sunset, Lorenzo Vernal estimated that the fleet had reached a point thirty miles to the northeast of Havana. Accordingly, he ordered a turn to the northward. Although the wind had changed little in strength or direction since morning, Vernal knew the weather had altered. The strikingly lovely deep-red sunset was disquieting in itself; its vivid colors were reflected in a thin veil of cirrus clouds that had overspread the sky. And Vernal saw how the sunset tint lit a towering bank of cumulus piled high in the southeast. At dusk a stronger breeze began to blow.

"Through a night of steadily rising wind, the fleet held its course. Toward dawn on Monday the ships entered the center of the Gulf Stream current. The tossing motion of the vessels brought discomfort, then uneasiness, then wholesale seasickness to many passengers and crewmen of the fleets. Early morning disclosed that a strong northeast wind was raking the opposite-flowing current of the Gulf Stream, raising vicious cross-seas.

"The ships reduced sail to weather the storm. Seamen went aloft to bring down the topmasts and reduce the windage there. All objects on deck were strongly secured and hatch covers firmly lashed down. As the morning passed, the day darkened and the weather worsened. The wind rose to a whole gale. The height of seas around the convoy mounted to more than ten feet, and flying spray torn from wavetops by the shrieking wind obscured the horizon. Visibility fell until pilots and lookouts on the ships could scarcely make out the vessels on the convoy's edge.

"Now the ATOCHA'S waist was almost continuously awash, as great seas swept around the overloaded ship. The pilot ordered the mainsail lowered so that the ship could go forward more easily under foresail alone. The sailors who struggled to comply with the order clung to the mainyard, battling lashing canvas, as the extreme ends of the yard dipped regularly into the boiling sea. What most disturbed the men at work, however, was what they had seen near the ship's stern: the fins and the upper bodies of two great gray sharks, following the ATOCHA through the storm.

1. E. Lyon, *The Search for the Atocha* (Harper & Row, 1979).

"Even with reduced sail area, the ship plunged wildly and became increasingly difficult to control. The helmsman could no longer steer properly, so the whipstaff was disconnected and the tiller lashed in place. At each heavy blow of the sea the ATOCHA'S hull shuddered and her masts creaked in their steps. Crashes below told of shifting cargoes and broken wine and olive jars.

"By the end of the long afternoon, many of the ships in the convoy had lost their mainmasts. Some had no steerage-way whatsoever, for their rudders had been shattered by huge following seas. One small ship, the BUEN JEUSE, had lost both masts and rudder; she fell farther and farther behind the other vessels and was finally lost to sight. Watchers aboard the ATOCHA saw the little NUESTRA SENORA DE LA CONSOLACION struggling along under a close-reefed foresail. To their horror, they saw the small craft suddenly capsize and vanish into the angry ocean. The could launch no boat in the wild seas, nor could they turn their own ship to go to the aid of those on the stricken vessel. The gnawing feeling grew among those on the ATOCHA that the same fate might well await them all.

"Long before sundown the world grew dark, and the chief pilot Vernal lit the Guard Fleet capitana's stern lantern. He could not tell at that point if any other ships survived to follow the lantern's gleam; as far as he could see, the capitana now sailed alone. Any protective sense of being in convoy had now gone, and each ship stall afloat struggled in its own lonely battle against the hurricane.

"Aboard the SANTA MARGARITA, silvermaster Gutierre de Espinosa called his aide, Aguirre, to his cabin. Bracing against the plunging motion of the ship, Espinosa opened his official trunk and asked Aguirre to help him take out some treasure. The two men removed eight gold disks and six gold bars, three small gold pieces, a silver bar, and some silverware; they placed it in Espinosa's personal sea chest. The silvermaster then locked the chest and bound it with rope. He had made his own private preparations for disaster.

"Meanwhile, below decks in the SANTA MARGARITA, Captain Bernardino de Lugo shouted for silence; frightened cries and groans of dispair faded, then died. Holding for support to a ringbolt, the captain motioned to the pale cleric beside him, and told his men that Chaplain Ortiz was ready to begin confessing them. He added that the two Jesuit priests aboard were in the cabins above, taking the confessions of the officers and passengers; they would also come to the gun deck to help there when they were through. Even greater than his dread of drowning at sea was a Spaniard's fear of dying in a state of sin. That could mean the loss of his soul for all eternity. The men crowded forward.

\* \* \*

"By the time the wind shifted to the south, both capitanas and nineteen other vessels of the combined fleets had passed to the west of the Tortugas and thus out of danger of grounding. Five unlucky ships—Vargas' ship the ROSARIO, the fleet patache (tender), the Portuguese slaver, the SANTA MARGARITA, and the ATOCHA, playthings of the wind—were swept irresistibly toward the Keys. A small Cuban coast-guard vessel was also caught up in the ill-fated group.

"To Spanish mariners, Florida was an evil name. Scores of shipwrecks dotted the esa bottom along its costs and in the Keys. In the isolated area that lay ahead of the six ships, Spain's writ scarcely ran. For more than fifty years, expeditions sent there from the Spanish capital at Saint Augustine had never succeeded in making lasting settlement. Sailors lost in the Keys had to run a double gauntlet: if they survived the ruin of their ship, they still had to face the untamed ferocity of the Keys Indians, who often killed shipwrecked men.

"The first light of dawn on Tuesday, September 6, revealed an awesome sight. As the Spanish ships came into more shallow waters, the seas became even steeper. The few men left on deck beheld a sea covered with huge rollers, their fifteen-foot crests

whitened by the gusting wind. Lookouts on the three westernmost of the ships saw vaguely ahead the outline of low islands—the Tortugas. The sailors heaved over their anchors to halt the ship's onward course to disaster. One by one their anchor lines broke, and the ROSARIO, the slave ship, and the fleet patache were grounded, wrecked in the shallows, battered by incoming storm waves.

"Meanwhile, forty miles to the east, the SANTA MARGARITA and the ATOCA approached a place where the trough of each passing wave bared the reef in a welter of foam.

"Only the stump of the MARGARITA'S mainmast remained; her rudder was gone and her foresail had blown away. When soundings showed rapidly shoaling water, three seamen crept forward to set a scrap of canvas on the foremast and attempted to claw back away from the reefs ahead. The makeshift sail blew out. When their anchors began to drag, the crew was helpless. The ship was pushed inevitably toward the place of danger. At seven in the morning, the SANTA MARGARITA surged across the reef on the crest of a wave. As the ship swept on, Captain de Lugo looked to the east. There to his astonishment, he saw the hull of another crippled galleon. It was the ATOCHA.

\*     \*     \*

"Fifty-five feet deep, off a wide shoal west of a stormswept circle of mangrove islands, lay NUESTRA SENORA DE ATOCHA. With her, frozen in time, lay seventeenth-century Spain.

"The southern sky had cleared. Except for fitful gusts, the wind had dropped, and the afternoon sun burned down fiercely on the place of disaster. With nightmare clarity, it revealed a churned and littered sea, its surface heaving with the refuse of shipwreck. The little merchant ship SANTA CRUZ had weathered the hurricane; it picked its way through floating planks and spars in the waters off the great sandbank. The small ship was already crowded with sixty-eight survivors of the SANTA MARGARITA, including Captain de Lugo and twenty of his men. Shortly after the sinking of the ATOCHA, the MARGARITA had grounded against the sandbar. By midmorning, battered by the waves, the ship had begun to break up. Only those who could keep a hold on floating wreckage had survived. Gutierre de Espinosa and all the passengers had perished. One hundred forty-three persons had drowned."

## SPANISH SALVAGE OF THE SANTA MARGARITA

The Spanish governor lost no time in commissioning Gaspar de Vargas to find and salvage the lost ships. Vargas sailed September 16, 1622 with five vessels for the lower Florida Keys. He found the wrecked galleons SANTA MARGARITA and ATOCHA lying six and ten miles respectively southeast of a low circle of wind wracked mangrove islands later to be named "Keys of the Marquis." A subsequent hurricane on October 5, 1622 and the 55 foot depth of the wreck site prevented meaningful salvage.

In 1624 an influential Havana politician, Francisco Nunez Melian, obtained a royal contract to search for and salvage the galleons and by June 1626, Melian's crew, in a bronze diving bell, found the main ballast pile of the SANTA MARGARITA.

Melian's salvors brought up 199 silver ingots, more than 30,000 silver coins, silverware and slabs of rough copper. After retreating to avoid hostile Dutch ships, Melian later returned to the keys, and salvaged an additional 151 silver bars, great masses of blackened silver pieces of eight, a large anchor, eight bronze cannon, copper slabs and silverware. Of the total of 350 silver ingots, 67 were discovered to be contraband not listed on official manifests. Nearly 20% of all treasure during this phase of salvage was contraband.

Salvage auditor Juan de Chaves later told of arduous salvage work in perilous currents under a pitiless sun, amid occasional heavy squalls. One diver, Juan Martinez, died at the wreck site in August of that year.

The 1627 diving season began less auspiciously. On Thursday, June 10, the salvors reached the wreck site just after dawn. They moored their longboat securely as morning light turned dark waters translucent blue, and set to work. By the salvage master's hand-held sundial it was eight o'clock when lookouts shouted "Sail! Sail!"

The Dutch enemy had reached the Marquesas. Cutting their mooring lines, the Spaniards fled over the quicksands into shallow water where the Dutch could not follow. The Spanish salvors escaped to Havana, and treasure salvage was discontinued for that year. The following year 37 more silver ingots and 3,000 coins were recovered.

Before the 1629 season could begin, Francisco Nunez Melian was appointed governor at Caracas, and left the salvage of SANTA MARGARITA and the search for the ATOCHA to other, less successful, hands. In 1644, while Melian was reviewing his troops, his horse reared and he was killed. An audit of his accounts of the SANTA MARGARITA salvage was sent to Spain to repose finally in the Archive of the Indies.

The Spaniards' efforts in salvaging the vessels during the 17th Century were only partially successful and were finally abandoned through the passage of time. An immense fortune continues to rest upon the ocean floor a few miles off the coast of Florida, covered by the shifting sands and mud of the southern reaches of the Gulf of Mexico.

## MODERN SALVAGE

All but forgotten, the remains of the 1622 Golden Galleons were subjected to the process of nature which eroded the structure of the vessels and diminished the possibility that the unsalvaged portions of her fabulous cargo would ultimately be returned to the mainstream of commerce. Although identified as a "wrecked vessel", the SANTA MARGARITA is more accurately termed a wreck site, for what the teredos and the passage of time have left for salvage is cargo scattered on and under an expanse of ocean floor. Remarkably, a substantial section of ribs and planking of this once great ship has somehow survived the passage of time and the ravages of the sea to be recovered. The timbers are of white oak, from the north of Spain and not found in the Caribbean.

In 1968, 324 years after Melian's death, the plaintiff, TREASURE SALVORS, INC., and its President, Mr. Mel Fisher embarked on a modern search for the lost galleons of the 1622 Fleet. Working with Mr. Fisher was Dr. Eugene Lyon, a Colonial Spanish Historian hired by the plaintiff corporation to research in the Archives of the Indies in Seville Spain. By 1971 Fisher and his group had followed the leads provided by Dr. Lyon from the SANTA MARGARITA'S salvage audit and had located a great anchor from the NUESTRA SENORA DE ATOCHA. Over the next nine (9) years, Fisher's company, TREASURE SALVORS, INC. incurred great expense in its lengthy legal battles to protect and retain finds from the ATOCHA. Mel Fisher and his wife, Dolores, suffered personal tragedy in the loss of their son and daughter-in-law at sea during the salvage of these lost galleons of the 1622 Tierra Firme Fleet. These legal battles are extensively documented. The litigation against the United States for title to the NUESTRA SENORA DE ATOCHA is reported at 569 F.2d 330 (5th Cir.1978) hereinafter referred to as *Treasure Salvors I*. The litigation against the State of Florida with regard to portions of the salvage, is reported at 621 F.2d 1340 (5th Cir.1980) hereinafter referred to as *Treasure Salvors II*.

Competing salvors appeared on the scene and commenced to observe the ongoing salvage activities of the Fisher organization at the ATOCHA site. Fearful that others would find SANTA MARGARITA before him, Mr. Fisher decided to increase the pace of the search by adding more men and equipment.

The documentary evidence of the MARGARITA'S location was less than precise with Bernardino de Lugo's statement placing the MARGARITA one league *west* of ATOCHA or just over three nautical miles

away. Mr. Jack Haskins, a modern salvor and skilled researcher had told Dr. Lyon about an ancient letter he had discovered written by Captain Aguilar Y Guzman, stating that the MARGARITA lay to the *east* of the ATOCHA.

Emphasizing the contradiction, Mel Fisher's searchers had recorded magnetometer contacts both east and west of the ATO-CHA wreck site in earlier searches. Mr. Fisher ordered continued exploration in both east and west areas. Urgency impelled him, for he feared that rivals might reach the SANTA MARGARITA first.

On March 13, 1979, Case No. 79–1381–Civ–WM and No. 79–1382–Civ–WM were filed in the United States District Court for the Southern District of Florida. The original wreck site description in Case No. 79–1381–Civ–WM was west of the ATOCHA wreck site. The original site description in Case No. 79–1382–Civ–WM was southeast of the ATOCHA wreck site. Both of the cases were filed on the available information and belief that the SANTA MARGAR-ITA was either three miles east, or three miles west, of the ATOCHA wreck site and upon the remote sensing data which had previously been gathered showing the existence of shipwrecks in both locations.

A well-financed competitor had moved in and begun operations near where Fisher was recovering the scattered remnants of the ATOCHA. In a hauntingly similar re-enactment of the Dutch against Melian's men, three and one-half centuries earlier, five shots were fired by the competitor and (in a subsequent incident) the competing vessels almost ran down a TREASURE SALVORS vessel, the *Virgilona.* The history of these modern-day pirates is reported at 640 F.2d 560 (5th Cir.1981) hereinafter referred to as *Treasure Salvors III.* On July 2, 1981, the Honorable Sidney M. Aronovitz issued a preliminary injunction protecting the right of TREASURE SALVORS to exclusive possession and control of the extensive wrecksite of the NUESTRA SENORA DE ATOCHA.

In January of 1980, Fisher called a meeting at Commander Cryer's house for the purpose of sharing the information gained from years of ocean searching and research in Spanish archives. All of the Treasure Salvors captains and other principals of the company attended for the purpose of pooling their knowledge in the search for the SANTA MARGARITA. Those present heard Dr. Lyon describe the Spanish Archival evidence gathered over years of research. Captain Robert JORDAN was present and participated in the meeting. At this meeting archival documents were shown to JORDAN and copies were later given to him. He subsequently was furnished a number of confidential company documents reflecting magnetometer readings, maps and charts of the search area. At the conclusion of the meeting JORDAN, archeologist Duncan Matthewson, salvors/photographers Don Kincaid and Pat Cline, and Melvin Fisher all marked on a map their best estimates of where they thought the MARGARITA lay.

In early February of 1980, Melvin A. Fisher, on behalf of the plaintiff, TREAS-URE SALVORS, INC., submitted a proposed contract to JORDAN, who over a period of days consulted with advisors (including Mr. Finley Ricard) and altered the contract prior to its execution. The contract, executed February 5, 1980, was signed by Captain JORDAN and by TREASURE SALVORS, INC. through its President, Melvin A. Fisher.

In addition to affording Mr. JORDAN the privilege of working the wrecks claimed by TREASURE SALVORS, the contract provided that he was to receive food, fuel, and lubricants for the M/V *Castillian* and $100.00 for each work day of four (4) hours or more at the wrecksites *for Mr. JOR-DAN'S* labor and the use of his vessel.

TREASURE SALVORS made payment to Mr. JORDAN under the Agreement and, in addition, provided him $50.00 extra per work day at the wrecksites. Mr. Kincaid gratuitously provided winches valued at $1,500.00 for Mr. JORDAN'S vessel to better stabilize it at anchorage and TREAS-URE SALVORS loaned Mr. JORDAN an extra radio. Mr. Finley Ricard (a financial

backer of Mr. JORDAN in other salvage ventures) provided other money for operation, dive equipment, detection gear and the cost of having the M/V *Castillian* hauled out and repaired when the crankshaft was damaged during the course of salvage operations in March, 1980.

To do the magnetometer work that was required, Captain JORDAN was provided an extremely expensive, one-of-a-kind, prototype precision, proton flux-gate magnetometer developed exclusively for TREASURE SALVORS by Faye Field. During the search carried out pursuant to the February 5, 1980 contract, this magnetometer provided by TREASURE SALVORS was used by Captain JORDAN on board his salvage vessel, *The Castillian.*

Winter weather in the Keys, often stormy, was cooperative in 1980. After a few days of fruitless magnetometer search west of the ATOCHA site, JORDAN took the *Castillian* to the eastern area where, at the edge of a wide sand bar, the instrument registered a concentration of electronic targets. JORDAN positioned his craft and found a small grapnel anchor, and then a very important discovery: a six foot diameter copper cooking caldron. Thereafter three small colonial anchors were found.

Don Kincaid, another employee of Treasure Salvors and a marine photographer who had first found the ATOCHA treasure, came aboard *Castillian* to help direct the search as salvage director. Following an electronic trail northward the crew found ballast stones covering the sea floor, Spanish pottery, indigo, and a clump of four encrusted silver coins.

For nearly a year, Case No. 79–1381–Civ–WM and No. 79–1382–Civ–WM had lain dormant with no process having been served on a defendant vessel and no substantive litigation *in rem* or *in personam* having been pursued. After finding and salving the anchors, copper pot and other artifacts, TREASURE SALVORS, on the 10th day of March 1980, amended the defendant vessel's described location under Case No. 79–1381–Civ–WM to an area being within 3,000 yards of coordinates located at N. Latitude 24 degrees 33.3 minutes and W. Longitude 82 degrees 17.0 minutes.

A witness testified that it was at this point that many of the participants started to believe that they had, at long last, found the SANTA MARGARITA. The coins found in March had been taken into the Marquesa's anchorage and, after cleaning, discovered to be Spanish pieces of eight, minted in the 1621 period of the reign of Phillip III—the same vintage as those from the ATOCHA. The shipwreck, however, appeared different from the ATOCHA in at least one respect; much of the material lay exposed on the bottom.

On April 4, 1980, in the shallow water along rocky outcrops northwest of the first finds, *Castillian* divers suddenly found three large heavy gold bars. One bar was more than eleven inches long and weighed over five pounds. The treasure was brought into Key West and delivered to TREASURE SALVORS, Inc. by Captain JORDAN where joyous divers broke out magnums of champagne and used one of the gold bars as a swizzle stick. Captain JORDAN entered into his log that the first gold of the MARGARITA had come to the surface.

TREASURE SALVORS, Inc., at approximately 10:00 a.m. April 4, 1980, caused the portions of the defendant vessel that had been salvaged to be arrested pursuant to admiralty law by a Deputy United States Marshal. This arrest of April 4, 1980, gave the United States District Court for the Southern District of Florida, *in rem* jurisdiction over the ongoing salvage of the defendant vessel. The court finds that Captain JORDAN was present in Key West on April 4, 1980 and had knowledge of the action taken by TREASURE SALVORS to effect the arrest, by the U.S. Marshal, of the articles salvaged.

After the discovery of the gold, Captain JORDAN became dissatisfied with the terms of his contract and consulted Mr. Fisher, President of TREASURE SALVORS to obtain a better division of the salvage. Mr. Fisher discussed this request with the Board of Directors of TREASURE SALVORS, INC. where it was denied.

On May 5, 1980 a second amendment to the wrecksite description was applied for by TREASURE SALVORS. This Court's order of May 12, 1980 allowed the amendment to the pleadings. The amendment of the wrecksite description of May 5, 1980 was based on site salvage data that was being originated on a daily basis not only by the *Castillian,* but also by the TREASURE SALVOR vessels, *Virgilona* and *Swordfish.*

On April 12th, two more gold bars were found. Pot shards, bones and lead sheathing came up as the salvage progressed. Except at slack tide, vicious currents ran across the wrecksite, making, as the 17th Century Spaniards had earlier observed, "___ the diving task very difficult." On May 9th, the *Castillian* turned in to TREASURE SALVORS a rich variety of artifacts: broken pottery, hundreds of clumped and single silver coins, and an eleven pound ship's bell, silver plates, a sword, and a fragmented mariner's astrolab.

A few days after the *Castillian's* May 9th find, Mel Fisher's son Kane dove on the site and found six silver ingots evenly spaced in two rows resting directly on bedrock. That was not all that met his eyes in the clear green water: he saw a great section of the remains of a wooden ship. It was twenty-three feet long with the ribs and planking capped by ballast stones and a conglomerate of incrusted artifacts.

Working the surrounding area, divers uncovered a gold bar, two more large (and one small) silver bars, silver bowls; an ink well and sand shaker, a candle stick and plate, and a silver spur. A one hundred and five pound mass of silver coins was brought to the surface still welded into the shape of the wooden chest that had long ago rotted away. One especially precious prize was a diamond cut emerald set in a gold ring. Beneath the green stone floated a seawater bubble forced in by the pressure of years beneath the ocean.

Dr. Lyon compared the markings on the silver ingots with those listed on the SANTA MARGARITA'S manifest. Five of the silver bars matched. The centuries dropped away as Dr. Lyon found Ingot No. 4718 and

the true significance of this modern day saga was brought into focus. Dr. Lyon's research established that the silver bar had been shipped at Portobelo, intended for Seville and the Brotherhood of the Holy Cross by the drowned merchant, Gaspar de Rojas. Cut into the blackened surface of the bar were Rojas's RX mark and S topped with a Jerusalem cross. Five of the other bars had markings and numbers identical to the manifest. The sunken vessel was unmistakably the SANTA MARGARITA!

THE TROUBLE WITH TREASURE

Captain JORDAN'S first-mate in March and April of 1980 was Mr. Craig Boyd. Captain JORDAN told Mr. Boyd he was dissatisfied with the February 5th contract between himself and TREASURE SALVORS, Inc. and that he was thinking of breaking the contract. Mr. Boyd advised Captain JORDAN to comply with the contract.

In May 1980, Captain JORDAN consulted attorneys regarding his rights under the employment contract and his entitlement to a larger share of the treasure being recovered from the *SANTA MARGARITA.* Up to this point in time, all of the salvaged artifacts and treasure had been brought by Captain JORDAN to the TREASURE SALVORS dock in Key West, Florida and delivered to the court appointed substitute custodian (TREASURE SALVORS, Inc.).

On May 21, 1980, Captain JORDAN'S attorneys filed suit in the United States District Court for the Southern District of Florida (80–1205–Civ–SMA), claiming salvage rights to the treasure. This suit was consolidated for discovery and trial with the pending case previously filed by TREASURE SALVORS and Mr. Fisher (79–1381–Civ–JLK). After signing the complaint on May 21st, the intervening claimant, ROBERT JORDAN, returned to Key West and loaded the *Castillian* with supplies and fuel charging the fuel to TREASURE SALVORS and requesting and receiving a TREASURE SALVORS' check to pay for the groceries for the upcoming trip. On May 23, 1980, the *Castillian* set sail from

Key West carrying on board, Robert LeClair and Frank Moody, Jr. who were employees of TREASURE SALVORS. Mr. Robert LeClair had received orders from Melvin Fisher, to keep watch over JORDAN'S activities.

In addition to the proton magnetometer on board the *Castillian* was a marine Radio Telephone provided to JORDAN by TREASURE SALVORS, INC.

Near the center of the SANTA MARGARITA site on May 25th, *Castillian's* divers hit a bonanza. Their excitement built as they recovered eleven large gold bars, four smaller ones, and a magnificent ten pound gold disk. In total fifty pounds of gold bullion was recovered. They also found five gold two-escudo coins, six small silver bars or disks, two ingots of Cuban copper, a quartzite stone cannonball, and 581 silver coins. The historical significance and uniqueness of the artifacts and items of treasure make valuation difficult. Many of the items are priceless. Trial testimony ranged from estimates of six to thirteen million dollars of treasure yielded so far from the grave of the *SANTA MARGARITA.*

On the evening of May 25, 1980, R.D. LeClair was prohibited by Captain JORDAN from using the radio telephone to inform TREASURE SALVORS, of the finds. However, Captain JORDAN used the radio telephone to call his wife, with whom he had arranged a secret code in order to prevent the court's substitute custodian, TREASURE SALVORS, or anyone else, from learning about the salvage recoveries. The secret code worked and arrangements were made to have the bonanza arrested under the newly filed *in rem* action. *Robert Jordan vs. The Wrecked and Unidentified Sailing Vessel, et al.,* No. 80–1205–Civ–SMA.

On May 26th, the *Castillian's* captain pulled her anchors and left the wrecksite. Captain JORDAN paused briefly at Key West Harbor, making another call on the radio telephone to find out whether he should turn the treasure over to the court's duly appointed substitute custodian (Treasure Salvors) or continue up the Florida Keys and meet with his personal advisors and financial backers. He chose to do the latter. Next, Captain JORDAN turned the *Castillian* into Hawk Channel and proceeded easterly up the Keys to Summerland Key, approximately thirty miles east of Key West. During the trip up the keys he disclosed to R.D. LeClair that he intended having a "confrontation" with his employer, TREASURE SALVORS and its President, Melvin Fisher.

Upon arriving south of Summerland Key, the *Castillian* was met by a smaller boat piloted by financial backer and advisor, Finley Riccard. After coming to the dock at Finley Riccard's house, the TREASURE SALVORS', employees, Moody and LeClair, were told that they should not attempt to contact TREASURE SALVORS. Soon thereafter, Captain JORDAN'S attorneys arrived at the Riccard house. Photographs were taken of the salvaged treasure and a celebration ensued.

While the *Castillian,* laden with treasure, remained the night of May 26th tied up to the dock at Finley Riccard's house, TREASURE SALVORS' representatives made several calls to the Riccard residence in an attempt to find out whether treasure had been discovered and why the *Castillian* and her crew had disappeared. No information was given to Mr. Fisher or his representatives. The next morning, Captain JORDAN took the *Castillian* back out into Hawk Channel to a point where it was hidden from view from the mainland. The treasure was still aboard. When Deputy United States Marshal, Peter Craig, arrived at Summerland Key, the *Castillian* was at anchor at Hawk Channel, and he had to be ferried out to the larger boat. When the marshal went on board to carry out the *in rem* arrest under Case No. 80–1205–Civ–SMA, the deputy marshal was not told that he was arresting MARGARITA treasure or that the treasure he was arresting was from the same lost vessel that he had executed *in rem* warrants upon earlier (April 4, 1980).

After the marshal's arrest of the treasure out on the water, Captain JORDAN brought the *Castillian* in (for a second time) to the dock at Finley Riccard's house. The TREASURE SALVORS' divers LeClair and Moody were told that they could now contact their employer, TREASURE SALVORS and they were allowed to leave the premises of the Riccard estate.

Prior to the voyage of May 23rd through May 26th, 1980, intervening claimant, JORDAN, had regularly turned over objects of salvage to the court's duly appointed substitute custodian, TREASURE SALVORS and he knew prior to May 21, 1980 that TREASURE SALVORS had filed an *in rem* action which claimed the defendant vessel.

The activities described above provoked a flurry of intense litigation. The late Judge William O. Mehrtens issued an ancillary warrant approving the transfer of the gold and silver to TREASURE SALVORS as the court's legal custodian and at the same time, Captain JORDAN'S case was transferred from Judge Aronovitz to Judge Mehrtens. The return of the treasures of the MARGARITA to the court's substitute custodian TREASURE SALVORS was accomplished by motion for warrant of arrest *in rem* as to the defendant vessel which was filed May 28, 1980, executed on May 29, 1980 and filed with the court on June 6, 1980.

### TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND MOTION TO SHOW CAUSE

On May 28, 1980 the plaintiff, TREASURE SALVORS filed an application for a temporary restraining order without notice and motion for preliminary injunction. It also filed a motion to show cause why ROBERT JORDAN should not be punished for contempt. A rule to show cause and a temporary restraining order were issued on May 28, 1980, by Judge William O. Mehrtens. An evidentiary hearing on the preliminary injunction and rule to show cause was heard June 2, 1980. At the conclusion of the lengthy hearing, the court found as follows:

Gentlemen, it appears to me and I find Mr. Jordan, at the time he went out there was under contractual relations to Fisher, and he owed Fisher a duty and obligation certainly that would exist between a normal employer and employee.

I find, of course, that he was unhappy and dissatisfied with his contract and was desirous of obtaining more.

On these particular days in question when an exceedingly lucky find was made, I find it was within the area covered by the Order of this Court, as amended.

I would be less inclined to find that Mr. Jordan had wilfully violated the order of this Court if he had taken some, to me, firm action in disowing contractual relations with Fisher.

But it seems to me inexcusable, really, to be operating under that contract and to charge to Treasure Salvors fuel and food and other things, and go out there. And certainly with the markings that were out there and with his previous work in that area, I think, really, that he is now embarking upon a course to unjustly enrich himself.

... I am going to make it a preliminary injunction, unless you gentlemen want to stipulate that you do not have any further evidence to offer on the matter....

But meanwhile, the temporary injunction has been made a preliminary injunction and I find him guilty of the wilful and deliberate violation of my order.

If there is any question as to jurisdiction, I also find that I have had and do have jurisdiction over the parties and the res and the subject matter of the law suits.

Since the preliminary injunction was issued on June 2, 1980, Captain JORDAN has provided no salvage services and has remained away from the SANTA MARGARITA wrecksite, carrying on other salvage on the reefs south of Sugarloaf Key and Marathon, Florida.

### THE SALVAGE CONTINUES

On the 6th of July, the salvage vessel, *Swordfish* was at anchor over an area

which at that time was one of the northern-most areas of the wrecksite to be salvaged. A sharp wind shift caused the *Swordfish's* anchor to drag, and when it finally held, diver Larry Beckman swam down and discovered, lying on bare bedrock, a bronze cannon. Twin decorative dolphins rode its great tube. On the SANTA MARGARI-TA'S arms list it appeared to have been one of the galleon's heaviest guns, at just under two tons.

July 8th could fairly be named "the day of the gold chains". TREASURE SAL-VORS divers had followed an artifact trail to a large clump of cannon balls. Two silver ingots and various coins were found amid rich shipwreck material. As sal-vor/photographer Pat Cline fanned around one ingot with his hands, a large gold chain popped up, then another and another, all attached in a tangled golden mass. All together there were fifteen chains recovered, the largest had 149 great ornate links. The salvage vessel *Virgilona,* moored near-by, uncovered six more gold bars and a disk of gold.

Duncan Matthewson, TREASURE SAL-VORS' Marine Archeologist, began an extensive study of the SANTA MARGARITA wrecksite and the material recovered from it. Mr. Matthewson, along with Dr. Lyon, compared Melian's records with the present site in order to discover how the ship had broken up. They concluded the grapnels may have been lost by Spanish salvors; one might even have been the anchor abandoned when the Dutch threatened Melian's salvage in 1627.

The wrecksite displayed a wider range of ceramic pipes and silverware than the ATO-CHA, but to the archeologist, the single most exciting thing was the large section of the ship itself. It was among the oldest and largest remnants of a Spanish ship ever found in the western hemisphere. It provided substantial physical evidence concerning Spanish Colonial ship construction.

Archeologist Matthewson delayed raising of the hull structure until the remnants of the galleon could be properly mapped in situ, preparatory to its conservation. A photo mosaic of the structure was made using 132 separate pictures pieced together. During the work on the hull structure, the sand around the timbers was removed by gently fanning for artifacts. Just beneath the structure, they found pig bones, several chili peppers, and two pieces of shoe laces, relics that spoke of the living beings once aboard the SANTA MARGARITA.

Perhaps the most valuable single item turned up while one of the *Virgilona's* divers was working a sand crater's edge. As the boat's tubular mail boxes deflected the prop-wash downward, digging the crater deeper, a round object emerged and struck the diver a glancing blow on the forehead. Before it could vanish in the current, he reached out and took into his hands a beautiful golden plate. The eight inch plate, an artifact of exquisite beauty, displayed an intricate pattern of neo-Moorish design.

On August 23rd, Syd Jones, Captain of the *Swordfish* saw a treasure mass on the ocean bottom. Lying together were nine more gold bars and eight chains! The same day the divers found the lid of an ivory box, decorated with delicate incised figures of mythical animals. Research later disclosed similar designs on an ivory box from Portu-guese Ceylon. Thus far did the network of Spanish imperial trade extend.

On August 25th the *Virgilona* returned to Key West with her priceless ancient cargo of barrel hoops, swords, an arquebus (a memento of Bernardino de Lugo's company of soldiers), a 50-pound clump of silver coins, and an ingot of silver. The skipper of the *Virgilona* Captain Mo Molinar, poured from a sack, a stream of twenty-five gold two-escudo coins.

As of the present time, it is evident that the SANTA MARGARITA has yielded a very great treasure. The treasure has been recovered along a scattered path of more than 4,000 feet long. The gold bullion alone, in 56 bars, disks, and bits, weighs more than 118 pounds. Mel Fisher and his men also found 180 feet of gold chain and 54 gold coins. It is the largest amount of gold bullion salvaged from a Spanish Gal-leon in modern times. The divers have

recovered nearly 15,000 silver coins and 18 silver ingots with a number of other valuable artifacts.

In artifact value the treasure is worth millions of dollars but the knowledge that will be gained from the shipwreck in ceramic dating, marine construction, and Hispanic culture generally will prove to be of much more enduring value than the bullion.

These findings of fact not only provide a comprehensive background for an understanding of the history of the wrecksite which led to these complicated events between the parties in modern times, but also provide the framework within which the governing law may be applied for determination of the parties' rights in this proceeding.

## II. CONCLUSIONS OF LAW

### JURISDICTION

This Court has jurisdiction over the subject matter pursuant to the Constitution of the United States, Article III, Section 2, Clause 1, 28 U.S.C. § 1333, and Rule 9(h) Fed.R.Civ.P., as a case involving an admiralty and maritime claim. Claims arising out of salvage operations are unquestionably within the admiralty jurisdiction of the Federal Courts.

■ There are several persuasive factors which lead the Court to the conclusion that it has qualified jurisdiction *in rem* over the wreck and wrecksite of the SANTA MARGARITA. First, thousands of artifacts from the wrecksite have been brought into the physical possession of the United States District Court. Second, through the Court's substitute custodian, TREASURE SALVORS, INC., there is a physical presence and control of the wrecksite by vessels, divers, equipment and otherwise and it could be said that this Court has the wrecksite *in custodia legis*. See *Treasure Salvors I,* fn. 5 at 335. Third, the wrecksite lies wholly and exclusively within the waters of contiguous zone of the United States in the Atlantic Ocean. Under the convention of the territorial seas and the contiguous zone, the coastal state has certain custom, fiscal,

immigration and sanitary authority within the contiguous zone. See *Treasure Salvors I,* fn. 14, at 338; *U.S. v. Gunnar Williams, et al.,* 617 F.2d 1063, 1096 (5th Cir.1980). The contiguous zone is considered the functional equivalent of the border and therefore affords an area of limited United States jurisdiction.

As between the parties to this litigation, it is conceded that this Court has *in personam* jurisdiction, by virtue of process duly served, to adjudicate the dispute between the parties as to all those objects from the wrecksite whose ownership is in issue. The Court has *in personam* jurisdiction of the parties to determine the validity of a contract between the parties and any rights conferred thereunder. Jurisdiction is also conferred based upon *in personam* principles to adjudicate and protect the rights of these parties on a continuing basis to complete the salvage of the wrecksite now before this Court.

Finally, this Court has *in rem* jurisdiction, coupled with *in personam* jurisdiction, over the parties to dispose of all artifacts brought up from the site of this wreck during the pendency of the lawsuit. *Cobb Coin Company, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel, etc.,* 525 F.Supp. 186, 194–197 (S.Dist.Fla. 1981); *Treasure Salvors, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel, etc.,* 569 F.2d 330, 333–336 (5th Cir. 1978); *Treasure Salvors v. The Unidentified, Wrecked and Abandoned Sailing Vessel, etc.,* 640 F.2d 560, 567–568 (5th Cir. 1981).

■ An *in rem* action for a salvage award against artifacts recovered from the remains of a centuries-old shipwreck states a claim within this Court's admiralty jurisdiction, governed by the judicial doctrine of finds and the principles of maritime salvage. *Cobb Coin,* 525 F.Supp. at 203 *citing Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330 (5th Cir.1978) (*Treasure Salvors I*); *Cobb Coin,* 549 F.Supp. at 548; *Eads v. Brazelton,* 22 Ark. 499 (1861); *Wiggins v.*

*1100 Tons, More or Less, of Italian Marble,* 186 F.Supp. 452 (E.Dist.Va.1960); *Brady v. S.S. African Queen,* 179 F.Supp. 321 (E.Dist. Va.1960); *Nippon Shosen Kaisha, K.K. v. United States,* 238 F.Supp. 55 (N.Dist.Cal. 1964); *Rickard v. Pringle,* 293 F.Supp. 981 (E.Dist.N.Y.1968); *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel, etc.,* 569 F.2d 330 (1978); Volume IIIA, M. Norris, *Benedict on Admiralty: The Law of Salvage,* 11–14 (7th Ed. Rev.1980); *Platoro Limited, Inc. v. The Unidentified Remains of a Vessel,* 614 F.2d 1051 (5th Cir.1980); *Treasure Salvors, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel, etc.,* 640 F.2d 56; and *Hener v. United States,* 525 F.Supp. 350 (S.Dist.N.Y.1981).

## ANALYSIS OF THE RIGHTS OF THE CLAIMANTS

The State of Florida initially claimed title to the treasure as an aspect of sovereignty, contending it had the right to protect the archeological heritage of the shipwrecks. TREASURE SALVORS, INC. claims title by virtue of having furnished Robert JORDAN the fruits of its years of extensive research as to the SANTA MARGARITA'S location, supplying him with equipment, provisions, and crew; and contracting with JORDAN to find the wreck. Robert JORDAN claims title to the treasure as a first finder not under contract of employment by TREASURE SALVORS, INC.

## CLAIM OF THE STATE OF FLORIDA

The Complaint in this cause was originally filed on March 2, 1979. The State answered on April 5, 1979 admitting that the coordinates given in the Complaint placed the wreck outside the State's territorial waters. On April 10, 1979, the State moved for elimination of requirement of security for stipulation of costs, reciting it in its supporting memorandum of facts and law:

Pursuant to the applicable rules of the court the STATE filed an answer to the Complaint in admiralty served upon it. The answer does not claim an interest in the unidentified, wrecked and abandoned sailing vessel, but in effect disclaims any interest in the wreck located at the coordinates stated. The answer specifically admits that the stated coordinates are outside the territorial waters of the State of Florida.

Based upon the State's representations, this Court entered an Order on May 5, 1979 granting the Motion.

Although the coordinates contained in Plaintiff's Complaint have been amended since the filing of the action, the present coordinates (like the ones initially filed) are outside the State territorial waters.

The seaward limits of the sovereignty lands of the State of Florida were established by the United States Supreme Court in *United States v. Florida,* 425 U.S. 791, 96 S.Ct. 1840, 48 L.Ed.2d 388 (1976). In that case, the Supreme Court states in pertinent part:

1. As against the State of Florida, the United States is entitled to all the lands, minerals, and other natural resources underlying the Atlantic Ocean more than three geographic miles seaward from the coastline of that state and extending seaward to the edge of the continental shelf, and the State of Florida is not entitled to any interest of such lands, minerals, and resources. As used in this decree, the term 'coastline' means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, as determined under the convention on the territory sea and the contiguous zone, 15 U.S.T. (Pt. 2) 1606.

In the early stages of this litigation, the State took the position that it would not assert a claim to the shipwreck here involved if it developed factually that the vessel was located outside the State's territorial waters. It is undisputed that the SANTA MARGARITA does not lie inside State territorial waters as established in *United States v. State of Florida, supra.* Once the State was satisfied, concerning the proof of location, it voluntarily withdrew its claim.

## CLAIMS OF TREASURE SALVORS AND ROBERT JORDAN

Each party seeks to be declared owner of the Defendant wrecksite, under the general law of "finds" and, alternatively, each seeks a salvage award for services performed on the wrecked vessel under the maritime law of salvage.

This Court holds that it is appropriate to apply both the law of "finds" and salvage in this action to determine rights to the remains of the wrecked and abandoned sailing vessel now scattered on a wrecksite stipulated to be the SANTA MARGARITA.

■ The MARGARITA is indisputedly an abandoned vessel whose location has been lost through the centuries and whose original owner is not in existence.[2] Under the law of finders, title to ancient and abandoned vessel vests in the person who first reduces that property to his or her possession. *Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel, etc.,* 569 F.2d 330, (5th Cir.1978).

■ As a general rule, under the law of finds, a finder acquires title to lost or abandoned property by "occupancy", i.e., by taking possession of the property and exercising dominion and control over it. It is well established that a finder does not acquire title merely on the strength of its discovery of lost or abandoned property. *Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel, etc.,* 640 F.2d 560, 571 (1981). *Cobb Coin Co., Inc. v. Unidentified, Wrecked, and Abandoned Sailing Vessel, etc.,* 549 F.Supp. 540, (S.Dist. Fla.1982).

■ Once in possession and control of an identifiable wrecksite, the exclusive right to recover on a continuing basis depends upon the intent of the salvor to do so and his proven capacity to continue the recovery. *Hener v. United States,* 525 F.Supp. 350 (S.Dist.N.Y.1981). The rights of a salvor who continues uninterrupted operations on an identifiable wrecksite are

dependent upon his demonstration of that degree of dominion and control which is appropriate under the circumstances. *Cobb Coin v. Unidentified, Wrecked and Abandoned Sailing Vessel, etc.,* 549 F.Supp. 540, citing *Eads v. Brazelton, supra; Treasure Salvors III, supra; Brady v. S.S. African Queen supra; Hener, supra.*

■ This Court holds that the wrecksite containing the scattered remains of the SANTA MARGARITA is abandoned property that was first discovered by employees of Plaintiff TREASURE SALVORS, INC., who were employed by the Plaintiff for that specific purpose, and TREASURE SALVORS is therefore entitled to all rights of a first finder under the law.

TREASURE SALVORS, INC. has, through its agents and employees been in continuous possession and control of the wrecksite and the defendant abandoned sailing vessel since it was first discovered. The Plaintiff, TREASURE SALVORS, INC., has carefully and systematically brought the discovered artifacts and treasure of the SANTA MARGARITA into the custody of the United States District Court for the Southern District of Florida. The Plaintiff has preserved the archeological provenance of the shipwreck and has clearly demonstrated its competence to satisfactorily salvage the remains of this magnificent vessel. Title to the recovered treasure of the SANTA MARGARITA is therefore vested in its first finder in possession and salvor, TREASURE SALVORS, INC.

### ANALYSIS OF THE CONTRACT

In reaching the conclusions set forth above and in analyzing the rights of the parties, the Court must examine the relationship between the claimants. In this case, there are two relationships. First, TREASURE SALVORS and JORDAN were parties to the February 5, 1980 contract and stood in a contractual relationship to each other. Even without the February

2. The modern day government of Spain has expressed no interest in filing a claim in this litigation as a successor-owner.

5th contract, however, the parties, as employer and employee, existed in a relationship as principal and agent. Thus, the Court must apply principles of contract law and principal/agent law to resolve the parties' dispute.

The claimant, ROBERT JORDAN, presents three theories in support of invalidating the contract of employment signed on February 5th by JORDAN and Mel Fisher, president of TREASURE SALVORS: misrepresentation of fact, mutual mistake of fact, and failure of consideration. These three theories rise and fall on JORDAN's contentions that (1) Fisher told JORDAN that Fisher had located the remains of the MARGARITA prior to the signing of the contract, and that (2) the first sentence of Paragraph One of the Agreement was an untrue statement when made. That sentence reads, in part, "Salvors is the sole owner against all claims of the sailing vessel 'Nuestra Senora de Atocha,' Margerita [sic], . . . ."

JORDAN claims that the statement in Paragraph One constituted a misrepresentation of a material fact as did Fisher's alleged statement that he knew the exact location of the MARGARITA. Relying on these representations, JORDAN agreed to be compensated[3] by a much smaller percentage of the treasures and artifacts of the MARGARITA than he would have demanded if he had known otherwise.[4] JORDAN argues that his reliance on the misrepresentation made the contract voidable, and that he successfully avoided the contract beginning on May 27, 1980, when he delivered salvaged items from the MARGARITA to the United States Marshal pursuant to his own recently filed claim in Case No. 80–1205–Civ–SMA.

▮ A contract created by two parties is not made in a vacuum. To understand the contract, the Court must view it in the context of the events and circumstances from which it arose. The Court must,

above all else, give effect to the parties' intentions. *Pennzoil Co. v. Federal Energy Regulatory Com'n,* 645 F.2d 360, 388 (5th Cir.1981). "Such intentions are to be drawn as much as possible from the language of the agreement, but where, as here, the agreement is silent on the issue, the Court may turn to extrinsic evidence for support." *Valley Cement Indus. v. Midco Equipment Co.,* 570 F.2d 1241, 1242 (5th Cir.1978). The Court must give due consideration to all surrounding circumstances including those during the negotiation period. *Morris v. Federated Mutual Inc. Co.,* 497 F.2d 538, 540 (5th Cir.1974).

▮ The Court finds, for reasons stated *infra,* that the evidence presented clearly reveals the parties' intention in entering into the contract of employment was to allow JORDAN, as a TREASURE SALVORS' employee, to explore and begin salvage operations east and west of the ATOCHA with the hope—nay, the expectation—of pinpointing the exact location of the MARGARITA.

Mel Fisher and ROBERT JORDAN were certainly not strangers to each other; they had been acquainted for fifteen years. They had contracted before on several occasions concerning the same type of exploration and salvaging contract as the instant one. In the mid 1960's, for example, JORDAN had worked for Fisher south of Marathon, Florida, on 1733 fleet vessels. In 1979, he had worked for Fisher off the beach at Fort Pierce, Florida, on 1715 fleet vessels. These undertakings were pursuant to the direction and control of Mel Fisher as JORDAN's employer. The history of the relationship of the parties, therefore, suggests the intention of the parties on February 5, 1980, was to enter into another contract of employment for purposes of exploration and salvage.

Events just prior to February 5th, during a period of pre-contract negotiations, however, are even more indicative of the par-

---

3. In addition to 5% of the recovery of treasures and artifacts from the wreck, JORDAN was paid a daily salary at all times while under the employ of TREASURE SALVORS.

4. This is JORDAN's argument for failure of consideration.

ties' intentions. JORDAN was given $600.00 by Mel Fisher to haul his boat, the *Castillian,* out of the water for repairs and to bring it down to Key West. When JORDAN arrived, he was asked to be present at a meeting at Commander John Cryer's house in late January. At this meeting, exclusive and extensive information based upon years of archival and on-site research was presented by Dr. Eugene Lyons, TREASURE SALVORS' historian and archival researcher, and others concerning the possible locations of the MARGARITA and other ancient Spanish wrecks. Captain JORDAN, in fact, was given over one hundred pages of translations of documents for his own reference and use. Results from TREASURE SALVORS' prior explorations at various sites were discussed. It was learned that archival research and magnetometer readings had suggested the MARGARITA wrecksite lay east or west of the ATOCHA.

At the end of the meeting, a large map of the area surrounding Key West was produced and the participants each marked their "best guesses" on the map as to the location of the MARGARITA and the rest of the ATOCHA based upon all the information which had just been presented. Mel Fisher, Captain JORDAN and others indicated their "best guesses." [5]

Several days after this meeting, the parties signed the Agreement in question. This Court finds, based on the events and circumstances preceding the signing of the contract, and based on the credibility of the testimony of the witnesses, that the intention of Mel Fisher and Captain JORDAN was to turn their "best guesses" into a reality by employing JORDAN to perform further exploration and salvaging in specific locations (i.e., east and west of the ATOCHA) until the wreck of the MARGARITA could be pinpointed.

JORDAN's course of performance during the existence of the contract supports the Court's finding concerning the intention of the parties. "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *Restatement (Second) of Contracts* (1981) § 202(4). Captain JORDAN was directed to several locations to explore and salvage over the course of his employment from February 5th and thereafter. If he had truly thought that Fisher had already pinpointed the location of the MARGARITA, he had the opportunity to object when he was directed to areas where his salvage operations yielded nothing. Yet JORDAN chose not to do so. Therefore, the Court finds that JORDAN's course of performance from February 5th and thereafter is consistent with the intention of the parties in forming the contract.

Although there is no claim to the contrary, this Court specifically finds that JORDAN and Fisher, as president of TREASURE SALVORS, entered into the contract of employment freely and voluntarily and with mutual assent. As previously mentioned, Fisher and JORDAN were not strangers to each other, having known each other for some fifteen years. They had contracted before on several occasions concerning the same type of contract as involved here. The language of the instant contract was pieced together from the previous contracts between the parties. Prior to February 5th, JORDAN took the proposed contract for 4–7 days to his financial backer, Finley Riccard, for consultation and advice. In addition, the signing of the contract was preceded by several days of discussion and negotiation of each sentence by the parties. The contract, in fact, was altered by both parties prior to the signing, thus evidencing a negotiated instrument.

---

**5.** Fisher's "best guess" later proved correct; JORDAN's proved considerably off mark. As discussed *infra,* this Court finds that Fisher at no time prior to the signing of the contract represented to JORDAN that he had anything better than a "best guess" as to the location of the MARGARITA.

Keeping in mind the intention of the parties in forming the contract, the Court now turns to a consideration of the claimant's claims that the first sentence of Paragraph One of the Agreement was untrue when made and that Fisher had represented he knew the exact location of the MARGARITA and that these constituted misrepresentations of fact. As previously stated, the statement in question reads, in part: "Salvors is the sole owner against all claims of the sailing vessel 'Nuestra Senora de Atocha,' Margerita [sic], . . . ." In order to render an otherwise enforceable contract voidable, a material misrepresentation of fact must be relied upon, and the contract must be disaffirmed. Calamari, *The Law of Contracts* § 9–13–15 (1977); *Classic Bowl, Inc. v. AMF Pinspotters, Inc.*, 403 F.2d 463, 466 (7th Cir.1968).

The Court finds that based on the evidence presented and the credibility of the testimony of the witnesses, there was no misrepresentation to Captain JORDAN concerning the status of ownership or the location of the MARGARITA wrecksite. TREASURE SALVORS had generally located the vessel as a result of its previous research and salvage efforts in the area. In March, 1979, it had filed a claim to the wrecksite in Case No. 79–1381–Civ–WM. The coordinates were based on the then available information and belief, including positive readings from remote sensing data showing the existence of a shipwreck, and were located east of the ATOCHA. [These coordinates were later amended on March 10, 1980 and again on May 12, 1980 to reflect recently discovered artifacts].

The task of locating ancient wrecksites, especially those such as the MARGARITA whose treasures and artifacts have been widely scattered by shifting currents and storms over the years precludes absolute precision in establishing exact coordinates which contain the wreckage.

Since the purpose of the contract was to pinpoint the location of the MARGARITA either east or west of the ATOCHA, this Court finds, and indeed the claimant stipulated on the opening day of trial, that the remains of the vessel discovered east of the ATOCHA on February 13, 1980, by Captain JORDAN and the TREASURE SALVORS crew on board the *Castillian* to be the MARGARITA as contemplated by the parties in their contract.

This Court also finds that the more credible testimony, considering the intention of the parties in forming the contract and the events at the January meeting, to be that Mr. Fisher never represented to JORDAN that he knew the exact location of the MARGARITA. It is clear from the nature of the meeting that the whole purpose of the meeting was to enable the participants to formulate educated theories as to the specific location of the wreck. JORDAN was aware that Fisher had, at best, a "best guess."

This Court further finds that JORDAN knew the purpose of his employment was to *ripen* TREASURE SALVORS' ownership in the MARGARITA wrecksite by pinpointing the location through further exploration and salvage efforts. This Court therefore finds that there could have been no misrepresentation concerning ownership of the wrecksite to JORDAN.[6]

Even if this Court had found there was a misrepresentation, which it has not, JORDAN must still establish that he reasonably relied to his detriment on that misrepresentation.

This Court finds the evidence shows JORDAN had not demonstrated such reliance. He knew TREASURE SALVORS had not yet found the wrecksite and that such was necessary to prove possession and control, essential elements of ownership. His course of performance subsequent to the signing of the contract supports this finding. JORDAN made no objection to Fisher when directed to areas where no artifacts or treasures were found—if he had relied upon Fisher's alleged representation that he had pinpointed the location, he would have questioned Fisher's directions.

**6.** Based on the foregoing analysis, the Court rejects the claimant's theory that there was a mutual mistake of fact or failure of consideration.

Finally, this Court finds that even if there were a material misrepresentation and that JORDAN had reasonably relied upon it when contracting, JORDAN affirmed the contract by accepting the benefits and thereby lost the right to disaffirm the contract.

■ A party operating under a material misrepresentation has the power to avoid the legal relations created by the contract. The power of avoidance, however, is lost by ratification of the contract and acceptance of the benefits. *Restatement (Second) of Contracts* § 7 (1981). In the instant case, after the signing of the contract of February 5, JORDAN was an employee of Mr. Fisher and TREASURE SALVORS. From that date on, Mr. JORDAN and his crew were paid daily wages by TREASURE SALVORS. Food and fuel for the *Castillian* were also supplied. The crew, in fact, were TREASURE SALVORS employees. Captain JORDAN, therefore, accepted these daily benefits for a period of more than one hundred days before attempting to avoid the contract by not delivering treasures and artifacts to TREASURE SALVORS, the lawful substitute custodian.

Even more than the daily benefits of food, fuel, wages, and crew, however, was the benefit to JORDAN of the wealth of information and knowledge about where to search for the MARGARITA which had been provided to him at the January meeting at Commander Cryer's house. TREASURE SALVORS had invested hundreds of thousands of dollars on both archival research of ancient Spanish documents and on actual site work. This information was freely given to Captain JORDAN.

This Court finds that JORDAN used the information extended him by TREASURE SALVORS and relied upon documents provided by TREASURE SALVORS during his employment by the company.

Much of the equipment on board the *Castillian,* essential for a successful salvaging operation, was provided by TREASURE SALVORS. In addition to hoists and winches, used to retrieve artifacts and treasures from the ocean floor, TREAS-URE SALVORS provided the VHS marine radio with ship-to-ship and ship-to-shore communications. The most important piece of equipment, however, was the highly sophisticated one-of-a-kind proton magnetometer. This enabled JORDAN to specifically locate treasure once his boat was in the general location as directed by Fisher.

■ In summary, this Court finds that JORDAN affirmed the contract of employment through his action—by accepting and making use of the benefits of salary, food, fuel, crew, information, and equipment from February 5, 1980 and thereafter. JORDAN also affirmed the contract through his regular course of conduct in turning over all artifacts discovered prior to May 25, 1980, to TREASURE SALVORS, the court-ordered substitute custodian of the treasures from the wreck. Therefore, even if there had been a material misrepresentation and detrimental reliance, which would have made the contract voidable by JORDAN, the power of avoidance was lost by JORDAN's ratification of the contract and acceptance of the benefits.

This Court notes that even if it were to find the February 5th contract of employment void *ad initio,* it would still find that based on the parties' course of performance from February to the end of May 1980, there was an enforceable implied employment contract between the parties, and that JORDAN was to receive a daily salary and, in addition, 5% of the treasures and artifacts recovered from the wreck of the MARGARITA as an employee of TREASURE SALVORS in return for his exploration and salvage efforts. *See Bloomgarden v. Coyer,* 479 F.2d 201 (D.C.Cir.1973).

This Court now turns to the arguments of the Plaintiff, TREASURE SALVORS. The plaintiff argues Captain JORDAN, as an employee of the company, breached its fiduciary duty to TREASURE SALVORS and breached the contract of employment by failing to deliver treasures and artifacts from the MARGARITA to the court appointed custodian on May 25, 1980 and thereafter and by establishing his own claim to the wrecksite.

An agent owes a duty of the utmost loyalty to his principal. *Laub v. Genway Corp.*, 60 F.R.D. 462 (S.D.N.Y. 1973). This is a fiduciary duty with respect to matters within the scope of the agency. A fiduciary is held to "the punctilio of an honor the most sensitive." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, C.J.). An agent must "act solely for the benefit of the principal in all matters connected with his agency." *Restatement (Second) of Agency* § 387 (1958). He must not compete with his principal concerning the subject matter of the agency. *Id.* at § 393.

> Everyone, whether designated agent, trustee, servant or what not, who is under contract or other legal obligation to represent or act for another in any particular business or line of business or for any valuable purpose must be loyal faithful to the interest of such other in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it. This is a rule of common sense and honesty as well as of law. The agent is not entitled to avail himself of any advantage that his position may give him to profit beyond the agreed compensation for his services. He may not speculate for his gain in the subject-matter of the employment. He may not use any information that he may have acquired by reason of his employment, either for the purpose of acquiring property or doing any other act which is in opposition to his principal's interest.

*McHaney v. McHaney,* 209 Ark. 337, 346, 190 S.W.2d 450, 454 (1945). *See B.J. McAdams, Inc. v. Boggs,* 439 F.Supp. 738 (E.D. Pa.1977).

The relationship of TREASURE SALVORS and Captain JORDAN was one of principal and agent. As an employee, JORDAN was in a fiduciary relationship to TREASURE SALVORS. JORDAN owed a duty to his employer to act with the highest degree of good faith and loyalty. He owed a duty to TREASURE SALVORS not to act for an adverse party *or himself* in any transaction within the scope of the agency.

This Court finds that JORDAN breached his fiduciary duty to TREASURE SALVORS when he did not deliver salvaged treasures and artifacts to the lawful custodian on May 25, 1980, and based on the events which transpired thereafter. The discovery on May 25 of an immense fortune in gold and silver, beyond man's wildest dreams, caused JORDAN to pursue his own selfish interests instead of those of his employer. The surreptitiousness of the events during the days of May 25 through 27 during which two TREASURE SALVORS' employees were prevented from communicating with their employer, lends credence to the Court's finding that JORDAN breached his fiduciary duty.

For the above-stated reasons, and based on the evidence produced at trial and the credibility of the testimony of the witnesses, this Court finds that Captain JORDAN breached his contract of employment and his fiduciary duty beginning on May 25, 1980, when he did not deliver treasures and artifacts found that day to the lawful custodian. By his actions and conduct in attempting to establish a claim to the MARGARITA while under the salaried employ of TREASURE SALVORS and while using the company's information, fuel, food, crew, and equipment, this Court further finds that JORDAN forfeits any right he might have to equitable consideration, under the theory of quantum meruit, for services rendered May 25, 1980, and thereafter.

## ANALYSIS OF THE RIGHTS OF TREASURE SALVORS UNDER THE LAW OF ADMIRALTY

The Court holds, first, that TREASURE SALVORS, INC., is entitled to a salvage award for the articles it has retrieved from the SANTA MARGARITA wrecksite. The three elements of a salvage claim are:

(1) that marine peril exists;

(2) that the service was voluntarily rendered; and

(3) that the effort was successful in whole or in part.

*Platoro Ltd. v. Unidentified Remains of a Vessel,* 518 F.Supp. 816, 820 (W.Dist.Tex. 1980), citing *Legnos v. M/V Olga Jacob,* 498 F.2d 666, 669 (5th Cir.1974), *Cobb Coin, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 549 F.Supp. 540, (S.Dist.Fla. 1982).

It is established in this Circuit that a marine peril exists in an ancient, abandoned shipwreck for purposes of meeting the requirements of a valid salvage action. *Platoro Ltd. v. Unidentified Remains of a Vessel,* 614 F.2d 1051, 1055 (5th Cir.1980); *Treasure Salvors I,* 569 F.2d 330, 337 and n. 13 (5th Cir.1978), quoting Norris, The Law of Salvage § 185 (1958).

█ The Plaintiff has satisfied the second and third elements of salvage claim as well. There is no dispute that TREASURE SALVORS voluntarily rendered the salvage service.[7] It was under no pre-existing duty to save the vessel and its cargo and apparel pursuant to, e.g., a contract or provision of law. Further, the Findings of Fact entered above by this Court amply demonstrate that TREASURE SALVORS successfully saved property of considerable historic, archeological, and monetary value.

### SALVAGE AWARD

█ As this Court has previously held, the public policy underlying salvage awards in the Admiralty Court is to hold out a "continuing incentive to undertake the physical and financial risks entailed in salvage operations and to bring the property thus recovered into court for a salvage determination." *Cobb Coin,* 525 F.Supp. at 207, *Cobb Coin,* 549 F.Supp. 540. The ele-

ments considered by the Admiralty Court in determining a salvage award are:

(1) the labor expended by the salvors in rendering the salvage service;

(2) the promptitude, skill and energy displayed in rendering the service and saving the property;

(3) the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed;

(4) the risk incurred by the salvors in securing the property from the impending peril;

(5) the value of property saved; and

(6) the degree of danger from which the property was rescued.

*Cobb Coin,* 549 F.Supp. at 557, *Cobb Coin,* 525 F.Supp. at 207, n. 15, *See also* Norris, 3A Benedict on Admiralty, The Law of Salvage, 7th ed. § 244.

The services rendered by TREASURE SALVORS, INC., with respect to each of these elements, have been discussed in the preceding portions of this opinion. The Plaintiff has clearly demonstrated its entitlement to a salvage award.

█ As this Court has held in previous decisions, the appropriate form of award in a case like this should differ from traditional awards. It should be given *in specie* because the property saved is uniquely and intrinsically valuable beyond its monetary value. See *Cobb Coin,* 525 F.Supp. at 198. The Court therefore holds that the plaintiff, TREASURE SALVORS, INC., shall be awarded all the artifacts it has recovered since the inception of this lawsuit, as com-

---

7. TREASURE SALVORS has expended considerable sums of money, vessels and manpower, to establish possession and control over the wrecksite of the SANTA MARGARITA. Prior to 1971, TREASURE SALVORS, interested in the recovery of the ATOCHA and MARGARITA, had explored sites in the Atlantic Ocean, off the Florida Keys, in the Bay of Florida along the Gulf of Mexico boundary of the Florida Keys, including Matecumbe Key. It is equally clear that Mel Fisher and TREASURE SALVORS made the first major, primary effort to direct their attention to the exploration in the Marquesas Keys area as a result of Dr. Lyon's discovery in the Archives of the Indies in Seville, Spain. On a trial and error basis, TREASURE SALVORS spent many months and years in areas east as well as west of the Marquesas. During the time it finally isolated a promising, productive and responsive area now known to contain the wrecksite of the NUESTRA SENORA DE ATOCHA and the SANTA MARGARITA. In excess of 7.1 million dollars was spent by the Plaintiff in this effort. *Treasure Salvors v. Unidentified Wrecked and Abandoned Sailing Vessel, etc.,* 546 F.Supp. at 925 (S.Dist.Fla. 1981).

pensation for its expenses and an award for superlative salvage services.

The Court further holds that TREASURE SALVORS has established a right to the protection of this Court to conduct further salvage activities, for as long as it demonstrates the requisite diligence and success in its efforts.

The Court therefore retains jurisdiction:

1. To protect the Plaintiff's valid salvage operations on the defendant wreck, and to adjudicate its rights vis-a-vis competing salvors who may assert a superior right to salve the defendant wreck, the area described in these pleadings, and

2. To adjudicate the Plaintiff's claim to a salvage award on a periodic basis. The plaintiff shall file in this Court, beginning on January 1, 1984, and on January 1st of each subsequent year, its claim stating with specificity the value of the salvage services performed and cataloguing the artifacts saved in the previous calendar year. Any failure to file by that date will constitute *prima facie* evidence that it has abandoned the defendant wrecksite, and the plaintiff will have thirty days to attempt to rebut that presumption, through appropriate pleadings, after which this case will be closed.

## INJUNCTION

The June 2, 1980 order temporarily enjoined the agents, employees, and attorneys of rival claimants from interfering with plaintiff's ongoing salvage operation. That injunction is hereby made permanent now that the plaintiff has succeeded on the merits of its claim under federal law.

## CONTEMPT

Mr. Robert JORDAN was held in contempt on June 2, 1980 by the Honorable William O. Mehrtens for violation of the Court's order appointing TREASURE SALVORS substitute custodian of the recovered artifacts of the SANTA MARGARITA.

The Court accepts Mr. JORDAN'S statement that he was motivated by a desire to obtain a Court ruling on his dispute with Mr. Fisher and TREASURE SALVORS, INC., over the terms of his employment contract. Fully recognizing that his methods were unorthodox and could have resulted in loss or destruction of priceless historical artifacts; nevertheless, the Court refrains from imposing punishment for the contempt and discharges the contemptor with the stern admonition to obey orders of the Court in the future.

## ATTORNEYS' FEES

The award of attorneys' fees and costs in admiralty is discretionary and specifically permitted in salvage cases. *Compania Galeana v. M/V Caribbean,* 565 F.2d 358 (5th Cir.1978), *Cobb Coin Co., Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel, etc.,* 549 F.Supp. 540 (S.Dist. Fla.1982). The Plaintiff has succeeded on the merits and is therefore entitled to an award of fees and costs from Robert JORDAN. It is, therefore

ORDERED, ADJUDGED and DECREED as follows:

1. TREASURE SALVORS, INC. is hereby awarded all artifacts and treasure recovered from the wrecked Spanish galleon SANTA MARGARITA lost September 5, 1622 and delivered into the custody of the Court.

2. The Court retains jurisdiction to protect the Plaintiff's valid salvage operations within the area described in this case and to adjudicate its claim to a salvage award on a periodic basis for those artifacts hereafter recovered.

3. The claimant Robert JORDAN, his agents and employees are permanently enjoined from interfering with the Plaintiff's ongoing salvage operations, its officers, agents or employees.

4. The *in rem* admiralty action, *Robert Jordan v. The Unidentified, Wrecked and Abandoned Sailing Vessel, et al.* Case No. 80–1205–Civ–JLK, is hereby dismissed with prejudice.

5. The Plaintiff is entitled to recover reasonable attorney's fees and costs. The attorney for the plaintiff shall file his affi-

davits for fees and costs within twenty (20) days of the date of this order.

DONE and ORDERED in chambers at the United States District Courthouse, Miami, Florida, this 18th day of January 1983.